811 A.2d 566

**Louis J. PORRECO, Appellant,**

v.

**Susan J. PORRECO, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 11, 2001.

Resubmitted June 6, 2002.

Decided Nov. 27, 2002.

Chris F. Gillotti, James H. Richardson, for Louis J. Porreco.

Frank L. Kroto, Joanne Ross Wilder, for Susan J. Porreco.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NEWMAN.

In this case we must decide whether a misstatement by one party to a prenuptial agreement of the assets of the other party constitutes fraud such that the prenuptial agreement is voidable. We find that there is no justifiable reliance by the party claiming fraud with respect to this representation and, accordingly, we reverse the Superior Court on that issue. We also remand this case to the Superior Court to review the determination by the trial court that a confidential relationship existed between the parties.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant Louis Porreco ("Louis") was forty-five years old, and previously married, when he met Appellee Susan Porreco ("Susan"), who was seventeen years old, in high school, living with her parents, and working part-time at a ski shop. The parties dated for over two years, during which time Louis provided Susan with an apartment, an automobile, insurance, a weekly allowance, access to one of his credit cards as a secondary card holder, and a gas charge account at his car dealership's fueling station.

When the parties engaged to be married, Louis presented Susan with an engagement ring. The parties dispute whether Susan knew at the time Louis gave her the ring that it was not a genuine diamond but, instead, a cubic zirconium. The trial court credited Susan's testimony that she believed the engagement ring contained a real diamond and did not discover that it was fake until the parties separated many years later.

However, prior to giving her the engagement ring, Louis had given Susan other rings that contained genuine stones.[1]

In July of 1984, Louis presented Susan with the first draft of a prenuptial agreement. Louis did not discuss the agreement with Susan, other than to say that it was a standard agreement with the provisions left blank, and that Susan should seek legal counsel. This first draft of the agreement made no provision for Susan, other than that she was to retain her separate property in the event of a divorce. Louis later presented Susan with a second version of the agreement, which provided that, in the event of divorce, Susan was to receive $3,500.00 for each year of marriage in lieu of alimony, alimony *pendente lite*, and spousal support. Also pursuant to this agreement, Louis would provide Susan with an automobile and health insurance for one year. In all other respects, the agreement provided that the parties would retain their separate property, including all increase in value thereof.

Prior to the execution of the final version of the agreement, Louis prepared, in his own handwriting, a personal financial statement that listed Susan's assets. Included in this list was an entry for the engagement ring, with the value listed at $21,000.00. Although the financial statement described the ring as an engagement ring, it did **not** state that the ring

1. Indeed, the appraisals of ladies' jewelry prepared by Schiffman Jewelers for Louis prior to his marriage to Susan indicate: a ladies' 18 karat yellow gold, green and black jade necklace, valued at $7,000; a ladies' yellow gold tourmaline, peridot and diamond ring, consisting of eight diamonds, eight tourmalines, and eight peridots, with a value of $2,500; a ladies' 18 karat white gold dinner ring with diamonds, valued at $10,000, and; a ladies' sapphire and diamond ring in a yellow gold mounting worth $13,000. R.R. at 51a–53a (appraisals submitted as exhibits not at trial, but at the deposition of Judah Samet, 5/28/98). The total appraised value of this jewelry was $32,500.

Louis' generosity did not end at the altar, either. These same appraisals showed jewelry acquired subsequent to the marriage as follows: a ladies' 14 karat yellow gold modern cuff-style bangle bracelet worth $12,500; a ladies' 14 karat yellow gold diamond collar, valued at $7,500; a ladies' 14 karat yellow gold amethyst and diamond pearl enhancer, appraised at $2,000; a ladies' 18 karat yellow gold sapphire and diamond ring with 12 baguette diamonds, worth $17,000; a ladies' 14 karat yellow gold sapphire and diamond bracelet, valued at $7,500, and; a pair of 14 karat gold diamond earrings worth $3,500. The total appraised value of this jewelry was $50,000.

contained a diamond, or any other kind of stone. The final version of the agreement contained a typed personal financial statement of Susan's assets, which also stated a value of $21,000.00 for the engagement ring. Based on this financial statement, the net worth of Susan's assets appeared to be $46,592.00.[2] Louis' personal financial statement—the accuracy of which is not in dispute—listed his net worth at $3,317,666.00. Susan testified that she understood that, as a consequence of signing the prenuptial agreement, she would only receive, in the event of a divorce, the lump sum payment of $3,500.00 per year of marriage, an automobile, insurance, and whatever individual assets she possessed. An attorney reviewed the agreement on Susan's behalf, although he conducted no negotiations for her.

When the parties separated more than ten years later, Susan took the ring to a jeweler in South Carolina, who informed her that it was not a diamond. Subsequently in the divorce proceedings, Susan filed a Petition for Special Relief to set aside the prenuptial agreement. Susan alleged three grounds for invalidation of the prenuptial agreement: (1) that Louis fraudulently induced her to enter the prenuptial agreement by misrepresenting the value of the ring; (2) that Louis breached a confidential relationship with her; and, (3) that Louis violated his duty, pursuant to our decision in *Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162 (1990), of a full and fair disclosure.

The trial court invalidated the prenuptial agreement. The court concluded that a confidential relationship existed between Louis and Susan, due to the difference in the parties' age, sophistication, wealth and status, and Susan's dependence on Louis for her material and social well-being. Louis breached this confidential relationship, according to the trial court, by having a prenuptial agreement drafted that was lopsided in his favor. Additionally, the court found that Louis misrepre-

---

2. The record suggests, however, that the value of all of Susan's assets, excluding the disputed engagement ring but including all other appraised ladies' jewelry, had a net worth of $38,622. For reasons not explained in the record, not all of the appraised ladies' jewelry itemized in note 1, *supra*, appears on the schedule of assets for Susan.

sented the nature and value of the ring in order to induce Susan to sign the prenuptial agreement, which she signed in reliance on Louis' representation as to the ring's value, and that this misrepresentation was material to her decision to sign the agreement. The court found credible Susan's testimony that if she knew that Louis had given her a fake ring and lied about it, she would not have signed the prenuptial agreement and "would not have married the man." Finally, the court declined to address Susan's claim that Louis violated his duty to provide her with a full and fair disclosure, pursuant to *Simeone.*

The Superior Court affirmed [3] in a 2–1 unpublished decision. The majority determined that Susan had proven, by clear and convincing evidence, that Louis fraudulently induced her to enter the prenuptial agreement by misrepresenting the value of the ring. Because the majority agreed with the trial court that the prenuptial agreement was voidable due to Louis' fraud, they did not address the merits of the determination by the trial court that Louis breached a confidential relationship with Susan. Judge Kelly dissented. In Judge Kelly's view, the remedy of invalidating the entire prenuptial agreement was too harsh. Instead, Judge Kelly would have required Louis to pay Susan $21,000.00 to compensate her for the value of the ring as stated in the prenuptial agreement, but would otherwise have enforced the agreement.

## DISCUSSION

█ We begin our analysis with a recitation of the standard of our review of an appeal from the decision of a court sitting in equity. We are bound by the facts found by the court, when supported by competent evidence in the record. *Kepple v. Fairman Drilling Co.,* 532 Pa. 304, 312, 615 A.2d 1298, 1302 (1992). "However, no such deference is mandated for conclusions of law, and we are at liberty to review such conclusions." *Id.* (citing *Presbytery of Beaver–Butler of United Presbyteri-*

---

3. Initially, the Superior Court quashed Louis' appeal as interlocutory; however, we vacated the Superior Court's quash order and remanded for consideration of Louis' appeal.

*an Church v. Middlesex Presbyterian Church,* 507 Pa. 255, 266, 489 A.2d 1317, 1323 (1985)).

■ The starting point for assessing the merit of any challenge to the validity of a prenuptial agreement is our decision in *Simeone.* In that opinion, we reevaluated our criteria for enforcing prenuptial agreements and rejected the paternalistic assumption in our caselaw that courts must scrutinize these agreements and refuse to enforce those that failed to make a reasonable provision for the other spouse. As we stated in *Simeone,* "[s]uch decisions rested upon a belief that spouses are of unequal status and that women are not knowledgeable enough to understand the nature of contracts that they enter." *Simeone,* 525 Pa. at 399, 581 A.2d at 165. Instead, we placed prenuptial agreements on the same general footing as other contracts, to be enforced pursuant to the well-settled principles of contract law: "[p]renuptial agreements are contracts, and, as such, should be evaluated under the same criteria as are applicable to other types of contracts." *Id.* at 400, 581 A.2d at 165.

■ In reorienting our standards for enforcing prenuptial agreements to the traditional principles of contract law, however, we did not lose sight of the fact that parties to these agreements do not necessarily deal with each other at arm's length. Accordingly, we reaffirmed "the longstanding principle that a full and fair disclosure of the financial positions of the parties is required." *Id.* at 402, 581 A.2d at 167. "Absent this disclosure, a material misrepresentation in the inducement for entering a prenuptial agreement may be asserted." *Id.* (citing *Hillegass' Estate,* 431 Pa. 144, 152–53, 244 A.2d 672, 676–77 (1968)). Thus, despite the prevailing theme in *Simeone* that the provisions of prenuptial agreements should be subject to no greater scrutiny than ordinary business contracts, we nevertheless continued the principle from our previous decisions that these agreements will only be enforced where the parties make a "full and fair" disclosure. In addition to preserving this vestige of our common-law caution towards the enforcement of prenuptial agreements, we af-

firmed that these agreements may be invalidated when fraud-
ulently procured. "If an agreement provides that full disclo-
sure has been made, a presumption of full disclosure arises.
If a spouse attempts to rebut this presumption through an
assertion of fraud or misrepresentation then this presumption
can be rebutted if it is proven by clear and convincing
evidence." *Simeone,* 525 Pa. at 403, 581 A.2d at 167 (citing
*Hillegass',* 431 Pa. at 152–53, 244 A.2d at 676–77). Thus, in
*Simeone,* we recognized two alternate bases for invalidating a
prenuptial agreement: (1) any ground for voiding a contract
under the common law (such as fraud); and (2) where a party
fails to make "full and fair" disclosure of his or her own assets
prior to entering the agreement.

Presently, we are not asked to decide the extent of the "full
and fair" disclosure rule of *Simeone;* neither the trial court
nor the Superior Court relied on this rule to invalidate the
prenuptial agreement. Rather, we must consider whether the
trial court properly concluded that Louis fraudulently induced
Susan to sign the prenuptial agreement by misrepresenting
the value of the engagement ring on the list of her individual
assets, which he prepared as part of the prenuptial agreement.

■ The elements of fraudulent misrepresentation are well
settled. In order to void a contract due to a fraudulent
misrepresentation, the party alleging fraud must prove, by
clear and convincing evidence: (1) a representation; (2) which
is material to the transaction at hand; (3) made falsely, with
knowledge of its falsity or recklessness as to whether it is true
or false; (4) with the intent of misleading another into relying
on it; (5) justifiable reliance on the misrepresentation; and (6)
resulting injury proximately caused by the reliance. *Bortz v.
Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999); *Gibbs v.
Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994). All of these
elements must be present to warrant the extreme sanction of
voiding the contract.

■ To be justifiable, reliance upon the representation of
another must be reasonable. *See In re Allegheny Interna-
tional, Inc.,* 954 F.2d 167, 178 (3d Cir.1992) (applying Pennsyl-

vania law). *See also* Restatement (Second) of Contracts § 164, Comment "d" ("A misrepresentation, even if relied upon, has no legal effect unless the recipient's reliance on it is justified."). While the nature of the relationship between the parties [4] may affect the reasonableness of one's reliance, we hesitate to find reliance justified where the party claiming reliance had an adequate opportunity to verify the allegedly fraudulent statements. As aptly stated by the United States District Court for the Eastern District of Pennsylvania in explaining Pennsylvania law:

> Whether reliance on an alleged misrepresentation is justified depends on whether the recipient knew or should have known that the information supplied was false. *Scaife Co. v. Rockwell–Standard Corp.*, 446 Pa. 280, 285 A.2d 451 (1971) (citing *Emery v. Third National Bank*, 308 Pa. 504, 162 A. 281 (1932)). Where the means of obtaining the information in question were not equal, the representations of the person believed to possess superior information may be relied upon. *Siskin v. Cohen*, 363 Pa. 580, 70 A.2d 293, 295 (1950).

*Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. 455, 460 (E.D.Pa.1994). Additionally, in *Moore v. Steinman Hardware Co.*, 319 Pa. 430, 179 A. 565 (1935), a case in which the plaintiff alleged fraud in connection with the sale of corporate stock, we stated, "[i]t has many times been pointed out that a buyer or seller is not entitled to rely on such statements where he has an equal opportunity to ascertain the facts affecting the value of the thing to be sold." *Id.* at 433, 179 A. at 566. Since *Simeone*, we have moved towards treating parties to a prenuptial agreement the same as parties to other contracts, with the attendant duties of investigation and due

**4.** As we discuss, *infra*, the Superior Court did not review the ruling of the trial court that there was a confidential relationship between Louis and Susan. We will not review that issue presently, but remand for the Superior Court to address this question in light of our standards for determining when contracting parties enjoy a confidential relationship. *Cf. Frowen v. Blank*, 493 Pa. 137, 144, 425 A.2d 412, 416 (1981) ("Rescinding a contract because of fraud calls into play one set of criteria; rescission based on the breach of a confidential relationship is another proposition.").

care for their bargain. We will, accordingly, judge the reasonableness of a party's reliance by the same standards.

In the present case, although we are bound by the factual conclusions of the trial court,[5] we cannot agree that Susan's alleged reliance on Louis' misrepresentation of the value of the ring on the schedule of her assets was justifiable. Susan had possession of the ring and was not impeded from doing what she ultimately did when the parties separated: obtain an appraisal of the ring.[6] She had sufficient opportunity to inform herself fully of the nature and extent of her own assets, rather than rely on Louis' statements concerning the valuation of her holdings. We find her failure to do this simple investigation to be unreasonable. Although we do not excuse Louis' actions, we will not sanction the avoidance of an entire prenuptial agreement—the consequences of which Susan admittedly understood—on the basis of fraud in these circumstances.

Because the Superior Court never reviewed the determination by the trial court that a confidential relationship existed between Louis and Susan, however, we will reverse and remand for consideration of that issue.

5. Because the trial court accepted as credible the testimony of Susan that had she known that Louis misrepresented the value of the ring, she would not have entered the prenuptial agreement and "would not have married the man," we are bound by the trial court's findings that this misrepresentation was material to Susan's participation in the agreement and that she relied on it. We note, however, that Susan undermined her supposed reliance on anything listed in her schedule of assets when she testified as follows: "Q: In your mind, you had agreed that you were going to sign this document no matter what it said? A: Yes." R.R. at 165a. Susan later retreated from this statement and asserted that she would not have signed an agreement that "included lies." Although this inconsistency in her testimony casts some doubt on Susan's assertions as to the importance of the schedule of assets to her decision to enter the prenuptial agreement, nevertheless we need not examine this question in detail because of our holding that her reliance was not reasonable.

6. Susan did not own the ring at that time, as our decision in *Lindh v. Surman*, 560 Pa. 1, 742 A.2d 643 (1999), makes clear that an engagement ring is a conditional gift, which does not vest in the donee until the marriage occurs. Our holding in *Lindh*, however, does not alter our conclusion that Susan could have had the ring appraised rather than rely on Louis' assertions of its value.

72

Chief Justice ZAPPALA, Justice CAPPY and Justice CASTILLE file a concurring opinion.

Justice SAYLOR files a dissenting opinion in which Justice NIGRO joins.

Justice EAKIN files a dissenting opinion.

Chief Justice ZAPPALA, concurring.

I join Justice Newman's opinion. I write separately to address my grave concern that the filing of an opinion that expresses itself in rhyme reflects poorly on the Supreme Court of Pennsylvania. While one may disagree intellectually with another's judicial philosophy, and the exchange of differing views is at the very core of a jurist's function, it is the substance of our views that should be the focus of discussion. The gravity of differing judicial views is diminished when the focus is taken away from their substance because of the form in which they are presented. I believe the integrity of this institution depends in great part upon the understanding that we engage in careful, deliberate and serious analysis of the legal issues that we undertake to examine. The integrity of the Supreme Court of Pennsylvania should never be placed in jeopardy by actions that would alter the perception of those whose lives and interests are affected by the decisions of the Court.

It is of little import whether the issue before the Court involves the decision to impose the death penalty on an individual, the economic interests of individuals or businesses, or the effect of divorce actions in Pennsylvania. Each issue addressed by this Court commands our thorough, weighty consideration. No matter addressed by this Court is frivolous.

The dignity of the Supreme Court of Pennsylvania, and the deserved respect that has been hard-earned, should not be diminished. I feel strongly that the expression of opinions issued by the highest court in the Commonwealth of Pennsylvania should reflect the gravity of our constitutional responsibility to our citizens. Our oath of office demands nothing less.

Justice CAPPY, concurring.

I concur only in the result reached by the majority opinion. I write in this case not because the legal issues presented by the parties require further elucidation, to the contrary my learned colleagues have presented ample discourse on those topics. I write because I too am genuinely concerned with the point raised by the learned Chief Justice in his concurring opinion.

It is axiomatic and I firmly believe that every jurist has the right to express him or herself in a manner that the jurist deems appropriate. My concern, however, and the point on which I concur completely with the Chief Justice, lies with the perception that litigants and the public at large might form when an opinion of this Court is reduced to rhyme. I, too, feel strongly that no case with which this court deals is any more or less important than any other; I will endeavor to prevent a contrary impression whenever possible.

Accordingly, although respectful of the wishes of my esteemed colleague in the dissent, I am constrained to join the concurrence offered by the Chief Justice.

Justice CASTILLE, concurring.

I join the lead opinion, but write separately to emphasize that there is another issue, which the courts below may have to address, before this matter can be finally resolved. Our reversal today is limited to the single issue brought before this Court: whether the prenuptial agreement was invalid as a result of fraud. But this is not the only open issue in the case.

In the initial action, appellee Susan Porreco alleged three distinct grounds for invalidation of the prenuptial agreement: (1) that appellant Louis Porreco fraudulently induced her to enter the prenuptial agreement by misrepresenting the value of the ring; (2) that appellant breached a confidential relationship with her; and (3) that appellant violated his duty of full and fair disclosure, as articulated in *Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162 (1990). Although appellee argued these three separate grounds, only the first ground is resolved by

this appeal. It is therefore possible that, on remand, appellee may prevail on one of the two remaining grounds.

In this regard, I note that neither of the courts below has yet to rule on the question of whether appellant violated his duty of full and fair disclosure by misstating the value of the ring given to appellee. This Court in *Simeone* held that full and fair disclosure of the parties' financial positions is required in a prenuptial agreement. 581 A.2d at 167. "Parties to [prenuptial] agreements do not quite deal at arm's length, but rather at the time the contract is entered into stand in a relation of mutual confidence and trust that calls for disclosure of their financial resources." *Id.* As noted in the lead opinion, a prenuptial agreement may be invalidated "where a party fails to make 'full and fair' disclosure of his or her own assets prior to entering the agreement." Op. at 570 (citing *Simeone*).

The trial court invalidated the agreement in this case on two of appellee's three grounds. First, the trial court found that appellant made a material misrepresentation regarding the value of the engagement ring, and thereby fraudulently induced appellee to enter into the agreement. Second, the trial court found that there was a confidential relationship between the parties, which appellant breached. The trial court did not, however, specifically pass upon the *Simeone* question.

On direct appeal, the Superior Court agreed that appellant fraudulently induced appellee into entering the prenuptial agreement by misrepresenting the value of the ring. Agreeing with the trial court's determination that fraud had occurred, the Superior Court did not address the alternative question of whether or not appellant breached the confidential relationship, nor did it reach the full and fair disclosure question raised pursuant to *Simeone*, which the trial court itself did not reach.

The only issue before this Court on discretionary review is whether the courts below properly concluded that appellant fraudulently induced appellee into the prenuptial agreement by misrepresenting the value of the engagement ring on the

list of her individual assets, which he prepared as part of the prenuptial agreement. The Court's holding is limited to finding that appellee's reliance on the misrepresentation was unjustifiable under common-law fraud principles, noting that "we are not asked to decide the extent of the 'full and fair' disclosure rule of *Simeone*; neither the trial court nor the Superior Court relied on this rule to invalidate the prenuptial agreement." Op. at 570. Thus, although we have held that the prenuptial agreement is not invalid as a result of fraud—which is a high standard in the law, requiring the party alleging fraud to demonstrate all six elements with clear and convincing evidence—we have offered no view on the other questions. The matter is being remanded to the Superior Court to determine whether or not the prenuptial agreement can be invalidated as a result of the trial court's finding of a breach of a confidential relationship. Depending on the outcome of that inquiry, the Superior Court may or may not have to reach the *Simeone* question. I would note that, if the Superior Court had to proceed to that inquiry, a remand to the trial court would be appropriate since that court never made a ruling on the question of full and fair disclosure.

Thus, although I agree with the lead opinion that the prenuptial agreement is valid with respect to the issue before this Court, *i.e.* fraud, I caution that the case is far from over since, upon remand, the prenuptial agreement may be found invalid on one of the two remaining grounds.

Justice SAYLOR, dissenting.

As I would not impose a duty to investigate upon Appellee, I respectfully dissent. Preliminarily, in the context of fraud or misrepresentation, the elements necessary to avoid a contract correspond with those required to establish tort liability. *See generally* RESTATEMENT (SECOND) OF CONTRACTS (Topic 1. Misrepresentation, Introductory Note) (1979) (explaining that the rules applicable in the contractual context conform to those provided for in tort, although because "tort law imposes liability in damages for misrepresentation, while contract law does not, the requirements imposed by contract law are in

some instances less stringent"). In either context, a recipient's reliance need only be justifiable. *See* RESTATEMENT (SECOND) OF CONTRACTS § 164(1); RESTATEMENT (SECOND) OF TORTS § 525; *see also Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994). Justifiable reliance represents an intermediate level of dependence, falling between reasonable reliance and mere or bare reliance. *See generally Field v. Mans,* 516 U.S. 59, 72–75, 116 S.Ct. 437, 444, 446, 133 L.Ed.2d 351 (1995) (collecting cases discussing the required level of reliance for common law fraud). Although whether one's reliance is justified depends upon the facts and circumstances surrounding the representation, *see id.* at 71, 116 S.Ct. at 444, 116 S.Ct. 437, as a general rule, there is no duty to investigate. *See* RESTATEMENT (SECOND) OF CONTRACTS § 172 (stating that "a recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing").[1]

Here, taking into consideration that the parties did not deal at arm's length, their age and experience disparity, the absence of any evidence indicating that Appellee failed to act in

---

1. *Accord* RESTATEMENT (SECOND) OF TORTS § 540. The rationale for such rule stems, in part, from the fact that a recipient's comparative or contributory fault is less relevant where, as here, the fraudulent representation was intentional as opposed to negligent. *See generally* DAN B. DOBBS, THE LAW OF TORTS § 474, at 1359–60 (2001). At the same time, however, an individual is not generally permitted to rely upon statements of opinion or expressions of intention. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 169, 171. In this regard, certain statements between buyers and sellers of goods are treated as opinion, for example, general statements of quality and value, provided that such declarations are "not so far removed from the truth as to be incompatible with the facts known to the maker." *See id.* at § 168 cmts. c, d. Here, the relationship between Appellant and Appellee was not that of buyer and seller and, for this reason, I would distinguish the case relied upon by the majority, namely, *Moore v. Steinman Hardware Co.,* 319 Pa. 430, 179 A. 565 (1935), which is cited for the proposition that Appellee had a duty to investigate where there was an equal opportunity to ascertain the facts affecting value. Moreover, *Moore's* holding drew from statutory authority, which provided that affirmations of value between buyers and sellers could not be construed as a warranty. *See id.* at 433 n. 1, 179 A. at 567 n. 1 (citing Section 12 of the Uniform Sales Act of May 19, 1915, P.L. 543).

good faith, the fact that the financial disclosure listing the value of the engagement ring occurred immediately before Appellee was to sign the prenuptial agreement, and the fact that Appellant had given Appellee numerous items of genuine jewelry prior to the engagement ring, and, more important, in light of the trial court's fact and credibility assessments, I would hold that the trial court did not err in concluding that Appellee's reliance upon the intentional misrepresentation by Appellant was justified.

Justice NIGRO joins this dissenting opinion.

Justice EAKIN, dissenting.

A groom must expect matrimonial pandemonium
when his spouse finds he's given her a cubic zirconium
instead of a diamond in her engagement band,
the one he said was worth twenty-one grand.

Our deceiver would claim that when his bride relied
on his claim of value, she was not justified
for she should have appraised it; and surely she could have,
but the question is whether a bride-to-be *would* have.

The realities of the parties control the equation,[1]
and here they're not comparable in sophistication;
the reasonableness of her reliance we just cannot gauge
with a yardstick of equal experience and age.

1. We cannot measure the justification for this appellee's reliance as if she were of equal age and experience.

It is held by the weight of authority that ordinary representations are not actionable unless the hearer was justified in relying thereon in the exercise of common prudence and diligence. But the respective character, intelligence, experience, age, and mental and physical condition of the parties are considerations which may vary this rule....

*Emery v. Third National Bank of Pittsburgh*, 314 Pa. 544, 171 A. 881, 882 (1934).

Determining whether reliance on a misrepresentation is justified is generally dependent, at least in part, upon such factors as the respective intelligence and experience of the parties....

*Benevento v. Life USA Holding, Inc.*, 61 F.Supp.2d 407, 417 (E.D.Pa. 1999) (citations omitted). *See also Fort Washington Resources v. Tannen*, 858 F.Supp. 455, 460 (E.D.Pa.1994)(court may consider sophistication and history of parties); *Siskin v. Cohen*, 363 Pa. 580, 70 A.2d 293, 295 (1950)(rescission for purchase of bar granted based on fraud; purchaser working under "handicap of inexperience").

This must be remembered when applying the test
by which the "reasonable fiancée" is assessed.
She was 19, he was nearly 30 years older;
was it unreasonable for her to believe what he told her?

Given their history and Pygmalion relation,
I find her reliance was with justification.
Given his accomplishment and given her youth,
was it unjustifiable for her to think he told the truth?

Or for every prenuptial, is it now a must
that you treat your betrothed with presumptive mistrust?
Do we mean reliance on your beloved's representation
is not justifiable, absent third party verification?

Love, not suspicion, is the underlying foundation
of parties entering the marital relation;
mistrust is not required, and should not be made a priority.
Accordingly, I must depart from the reasoning of the majority.