J-A14002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JOSEPH CRAIG FRANCZAK | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARY E. FRANCZAK | |
| Appellant | No. 1892 MDA 2015 |

Appeal from the Order Entered September 28, 2015
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 2012-00717

| | |
|---|---|
| JOSEPH CRAIG FRANCZAK | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARY E. FRANCZAK | |
| Appellant | No. 2203 MDA 2015 |

Appeal from the Decree November 24, 2015
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 2012-717

BEFORE:  BOWES, OTT AND PLATT,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 19, 2016**

In these consolidated appeals, Mary E. Franczak ("Wife") appeals from

the November 30, 2015 divorce decree and the concomitant order denying

---

*  Retired Senior Judge assigned to the Superior Court.

her exceptions to the equitable distribution of the marital estate that she accumulated with Joseph Craig Franczak ("Husband"). We affirm.

Husband and Wife married on August 14, 1982, and separated between December 2008 and February 2009.[1] On July 27, 2011, Husband sent Wife a proposed property settlement agreement and encouraged her to discuss the proposal with an attorney. He later provided Wife a formal accord that paralleled the July proposal in all relevant respects.[2] In addition to Husband's commitment to pay Wife's expenses for five years, in lieu of alimony, and 100 percent of Husband's 401(k) benefits, Wife retained her retirement account, automobile, and personal property.[3] She also received

---

[1] The precise date of separation is disputed. While Husband testified that the parties separated during December 2008, Wife asserted that the separation occurred approximately two months later on February 11, 2009. The trial court found that the parties separated during 2008. *See* Trial Court Opinion and Order, 9/28/15, at 1.

[2] Two small differences existed. The July proposal provided that Husband would retain twenty-five percent of his 401(k) benefits and continue to pay several of Wife's household expenses for seven years. However, under the September agreement, Wife received 100% of the 401(k) and five years of of financial support. During the evidentiary hearings, Wife denied that she ever received the July proposal.

[3] As it relates to the financial considerations in lieu of alimony, the agreement provided:

> 7. ALIMONY: Both parties acknowledge and agree that the provisions of this Agreement providing for equitable distribution of marital property are fair, adequate and satisfactory to them and are accepted by them in lieu of and in full and final

*(Footnote Continued Next Page)*

- 2 -

the marital home and real estate in Enola, Pennsylvania. Husband retained his personal property, three automobiles, a second parcel of land in Enola, and a twenty-acre estate that he purchased following the parties' separation.

On September 13, 2011, the parties executed the property settlement agreement before a notary public. Prior to signing the accord, Wife sought the assistance of two attorneys; however, neither lawyer that she approached was able to review the document or provide legal counsel. Wife drove her own car to the appointment at the notary's office, and upon arrival, never stated any objections to signing the agreement at that time. As it relates to the issue on appeal, in executing the accord, both parties warranted that they disclosed "all assets of any nature whatsoever in which

*(Footnote Continued)* _____

> settlement and satisfaction of any claims or demands that either may now or hereafter have against the other for support, maintenance or alimony. Husband and Wife further, voluntarily and intelligently, waive and relinquish any right to seek from the other any payment for support or alimony.
>
> . . . .
>
> 27. UNDERLYING CONSIDERATION: In consideration of the above, Husband agrees to pay the mortgage and real estate taxes at 1064 Country Club Road, Camp Hill, Pennsylvania, together with the PP&L bill, the UGI bill, the home owners insurance and car insurance for the Wife for a period of five (5) years from the date of the execution of this Agreement. Beyond that five (5) year period, Wife shall be responsible for the mortgage and all other expenses as it relates to 1064 Country Club Road. In the event Wife decides to sell 1064 Country Club Road or transfer title to same, within the next five (5) year period, upon transfer, Husband's obligation shall cease.

[they have] an interest, the sources and amount of the income of such party of every type whatsoever[.]"[4]   Separation and Property Settlement Agreement, 9/13/11, at 5.  Additionally, they confirmed "that they are aware of the accounts of the other, the assets of the other, [and] the values of

_____

[4] The settlement agreement had two disclosure recitals:

> 15. DISCLOSURE: Husband and Wife each represent and warrant to the other that he or she has made a full and complete disclosure to the other of all assets of any nature whatsoever in which such party has in interest, the sources and amount of the income of such party of every type whatsoever and of all other facts relating to the subject matter of this Agreement.
>
> The parties agree that Husband provided an itemization of marital assets and supporting documentation thereto unto Wife, which said documentation Wife has acknowledged receiving and having had the opportunity to review what sets forth the marital assets and the values thereto.
>
> . . . .
>
> 31. DISCLOSURE: Husband and Wife agree that they are aware of the accounts of the other, the assets of the other, the values of those accounts and assets, as well as indebtedness of the respective parties. The parties execute this Agreement, expressly being familiar with all assets of said marriage, and further, both parties acknowledge that they have had sufficient time to explore all assets and values of all property owned individually and/or by and between the parties. Having done so, the parties fully agree that there has been a full disclosure of all assets, and the execution of this Agreement, intending to resolve all marital issues by and between the parties.

Separation and Property Settlement Agreement, 9/13/11, at 5-6, 8.

those accounts and assets[.]" *Id*. at 8. The parties also agreed that the accord would not be incorporated into any subsequent divorce decree.

On February 8, 2012, Husband filed a divorce complaint that omitted any reference to equitable distribution. Wife countered with petitions to appoint a divorce master to address the economic issues. Invoking the settlement agreement, Husband moved to strike the appointment of a divorce master as well as Wife's claims for equitable distribution. Wife disputed the validity of the agreement. She asserted that the accord was executed under duress and based upon fraud and Husband's misrepresentation of, *inter alia*, the value of the 401(k) account that she had been awarded.

The divorce master was appointed, and at the conclusion of evidentiary hearings on January 29 and March 26, 2015, he issued a report and recommendation upholding the validity of the settlement agreement. Wife filed timely exceptions, which the trial court denied on September 28, 2015. Wife appealed that order, and subsequently appealed the November 24, 2015 divorce decree.

She presents the following questions for our review:

I.    Whether the trial court erred in upholding the property settlement agreement because Wife was not provided with full and fair disclosure of the value of Husband's retirement accounts at the time the agreement was signed?

II.    Whether the trial court erred in upholding the property settlement agreement because Wife signed the agreement as a result of fraud, misrepresentation, and duress?

III.    Whether the trial court erred in not awarding wife equitable reimbursement alimony because the withdrawals by husband from the retirement accounts amounted to dissipation of a marital asset?

Wife's brief at 4.[5]   We address these issues *seriatim*.

Contract law governs marital settlement agreements that are incorporated but not merged into a divorce decree. **Paroly v. Paroly**, 876 A.2d 1061, 1063 (Pa.Super. 2005).  Our Supreme Court explained,

under the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties. **Robert F. Felte, Inc. v. White**, 451 Pa. 137, 302 A.2d 347, 351 (1973).

In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. **Pines Plaza Bowling, Inc. v. Rossview, Inc.**, 394 Pa. 124, 145 A.2d 672 (1958). When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. **Hutchison v. Sunbeam Coal Corp.**, 513 Pa. 192, 519 A.2d 385, 390 (1986).

**Kripp v. Kripp**, 849 A.2d 1159, 1163 (Pa. 2004).

Additionally, "a court's order upholding the agreement in divorce proceedings is subject to an abuse of discretion or error of law standard of review." **Paroly**, **supra** at 1063.  As we explained in **Paroly**, "[a]n abuse of

---

[5] As Wife does not challenge the validity of the divorce decree, we affirm the decree without further discussion.

discretion is not lightly found, as it requires clear and convincing evidence that the trial court misapplied the law or failed to follow proper legal procedures." *Id*. Stated simply, "[w]e will not usurp the trial court's factfinding function." *Id*. Similarly, we will not revisit the reasonableness of a marital settlement agreement to determine its validity. *Id*. at 1065. Instead, "Absent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements." *Id*. (quoting *Simone v. Simone*, 581 A.2d 162, 165 (Pa. 1990)).

Where, as here, "an agreement provides that full disclosure has been made, a presumption of full disclosure arises." *Simone*, *supra* at 167. However, a spouse can rebut this presumption with clear and convincing evidence of fraud or misrepresentation. *Id*. As we succinctly summarized in *Paroly*, *supra* at 1067, "Distilled, [the] case law provides that[,] where the circumstances indicate that a spouse has knowledge of the general value of the couple's assets, an agreement will be upheld, especially where . . . the agreement recites that full and fair disclosure was made."

Wife does not dispute the agreement's disclosure provisions or contend that she was denied the ability to verify the balance of the 401(k) or seek the advice of counsel before signing the agreement. Instead, the crux of Wife's argument is that, notwithstanding the disclosure recitals, Husband failed to provide a full and fair disclosure of the balance of his 401(k) account as of the date that the agreement was executed. She contends that

Husband had knowingly liquidated the retirement accounts almost entirely during 2009 and failed to disclose that fact to her when he proposed to give her the account as part of the marital settlement.

The following facts are relevant to this issue. Husband is in the mortgage business and worked for several financial institutions. Near to the parties' separation, but more than two and one-half years before the settlement agreement, Husband accepted a position with Chase Bank earning a guaranteed annual salary of $360,000, a significant increase from his prior position as a loan officer with Susquehanna Bank. In anticipation of his new position, he purchased his current residence on twenty acres of farmland on Heisers Lane in Carlisle, Pennsylvania for $675,000. In order to secure the property, Husband withdrew $482,461.28 from his 401(k) retirement account for a cash payment of approximately $400,000 and mortgaged the remaining $275,000. He intended to replenish the 401(k) account within ninety days in order to avoid the harsh tax consequences. Unfortunately for Husband, the employment opportunity did not come to fruition, and he returned to his prior position earning $90,000 at Susquehanna Bank. Without the increased income, Husband was unable to obtain a mortgage through the Veterans Administration and repay the money to the retirement accounts. He apparently was unwilling to sell his newly-acquired property to replenish the account. Husband initially omitted the income from the joint federal tax return that he filed with Wife, but he

subsequently notified the Internal Revenue Service ("IRS") about the discrepancy. After discovering the prohibited withdrawals, the IRS imposed penalties and interest. During May 2013, Husband paid the IRS $319,834.19. Wife was granted innocent spouse status for husband's misfeasance.

Wife asserts that at the time of the 2011 accord, she believed that the 401(k) had an estimated worth of $700,000 based upon her review of an earlier statement and Husband's prior account of its value. In reality, however, by 2009, the combined balance of the three investment accounts that formed the 401(k) was approximately $480,000, and Husband disgorged all but approximately $7,000 from the accounts in order to purchase his residence. Wife maintains that, when she executed the agreement and agreed to accept the 401(k) as part of the property settlement, she was unware that Husband had depleted it. She denied that Husband told her that he used the 401(k) to purchase his home and adds that she did not discover the IRS investigation of Husband's withdrawals until after she executed the agreement. Finally, she contends that, when she asked Husband how he paid for the Heisers's Lane estate, he repeatedly deflected the discussion regarding the source of the funds and simply told her that it "was under water." N.T., 1/29/15, at 65-67. Hence, Wife asserts that, since she had no knowledge that the accounts had been depleted, she presented clear and convincing evidence to set aside the settlement

agreement, notwithstanding the fair disclosure recitals that affirmed her awareness of the asset's value when she signed the accord.

In response to Wife's accusations of fraud, Husband testified that Wife knew that he liquidated the 401(k). He stated that he informed her of the source of the funds that he used to purchase the property and that one discussion in his driveway during January or February 2010 included a third party, Bev Masland. He also discussed with Wife the adverse tax consequences of his actions. Husband denied that he ever informed Wife that the 401(k) exceeded $500,000 and testified that Wife had access to the 401(k) statements, which came to the marital residence, and she never requested that he provide her with copies of the statements. Husband further explained that, had he replenished the $480,000 that he depleted from the 401(k), he would not have agreed to give Wife the account because an award of that sum would be completely incongruous with the remainder of the agreement in light of the property Wife received and his commitment to provide her continued financial assistance until 2016. Husband explained, "It would have been way out of line. I tried to get the numbers where I thought [it] was quite equitable . . . given the difference in income." N.T., 1/29/15, at 22. He continued, "if that money would have been there, it would have been a totally different arrangement." *Id*. As of the date of the accord, the 401(k) had a balance of several thousand dollars. *Id*.

After considering the foregoing evidence, the trial court determined that the property settlement agreement unambiguously provided that full and fair disclosure had been provided and that Wife failed to overcome the presumption of disclosure by clear and convincing evidence. Specifically, the trial court made a credibility determination in favor of Husband and against Wife, reasoning, "Collectively, the testimony and circumstances indicate that [Wife] knew that the retirement accounts had been used to purchase the home and therefore contained minimal funds."[6] Trial Court Opinion, 9/28/15, at 5. Upon review of the certified record, we cannot view the trial court's decision as an abuse of discretion.

The agreement recited that disclosures had been made, and in light of the credibility determinations rendered by the trial court, the presumption of disclosure is insurmountable in this case. While Wife protested that she was never informed that Husband depleted the 401(k), the certified record does not sustain Wife's allegations of misrepresentation. In fact, the testimony and exhibits introduced during the evidentiary hearing support Husband's

---

[6] Wife denied that she received notice from the IRS during 2011 and asserted that she did not know of the IRS investigation until the summer of 2012, approximately one year after she executed the property settlement agreement. *See* N.T. 1/29/15, at 43. While the record supports the trial court's finding that Husband told Wife of the tax consequences of the withdrawals at least one year prior to the agreement, insofar as the IRS did not provide formal notice of its inquiry until January 2012, the record also supports Wife's testimony that she did not receive the IRS notice until after she executed the settlement agreement. *See id*. at 45; Exhibit 3.

assertions that, while he may not have initially informed Wife of his plan to utilize his 401(k) retirement account as a short-term funding source to help finance his post-separation acquisition of real estate, he informed her in 2010 of the adverse tax consequences of those withdrawals. Moreover, the certified record belies Wife's testimony that she reviewed a statement prior to August 2011 and observed that the account totaled close to $700,000. Recall that Husband introduced into evidence financial statements that demonstrated the combined value of the 401(k) to be approximately $480,000 before he admittedly depleted it during December 2009. Husband failed to replenish the 401(k) at any point, and the IRS investigation and subsequent penalties bolster Husband's rendition of the events. Indeed, two of the three retirement accounts were closed as a result of the withdrawals and the third was left with a balance of $7,870.45. All of this verifiable evidence gives lie to Wife's bare contentions that she observed a $700,000 balance in the account "at one time" and her purported reliance upon Husband's alleged assertion during 2011 that "it's all there" in response to her inquiries to whether the 401(k) would be close to one million dollars. N.T., 1/29/15, at 39.

As we are bound by the trial court's credibility determinations that are supported by the certified record, we will not disturb the court's findings in favor of Husband. **Mackay v. Mackay**, 984 A.2d 529, 533 (Pa.Super. 2009) ("with regard to issues of credibility and weight of the evidence, this Court

must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand."). Furthermore, insofar as the trial court found that Wife knew that the 401(k) had been significantly depleted and knew the value of the remaining assets forming the marital estate, this case is unlike ***Ebersole v. Ebersole***, 713 A.2d 103 (Pa.Super. 1998), and ***Mormello v. Mormello***, 682 A.2d 824 (Pa.Super. 1996), two decisions that Wife cites in support of her position. ***See Ebersole***, ***supra*** (availability of financial records is insufficient to satisfy full and fair disclosure when agreement did not recite a full and fair disclosure, refer to property values, or enumerate marital assets); ***Mormello***, ***supra*** (contrary to disclosure *proviso*, evidence established that Wife was unaware of value of marital estate). No relief is due.

Wife's second issue alleges fraud in the inducement and duress based upon the circumstances of the agreement's execution. This argument has two components. First, Wife reiterates Husband's alleged concealment of the fact that he depleted $480,000 from his 401(k). We addressed this contention, *supra*, and discerned no basis to overturn the trial court's credibility determination. We do not revisit this argument herein.

The second component of Wife's claim asserts that she would not have executed the property settlement but for Husband's misrepresentation that the couple would remain married despite the agreement and that the accord was a legal maneuver to protect their marital estate from the potential

consequences of a criminal investigation. Presumably, Wife believed that Husband's criminal liability was tied to his financial resources. Specifically, Wife alleges that Husband told her that he was under investigation for bribing a judge of the Court of Common Pleas in Perry County.[7] She also contends that the couple maintained an intimate relationship during the summer of 2011, that she believed Husband, and that he entreated her to sign the agreement in order to protect their future together. Wife described the manner in which Husband informed her about the alleged crime and his plan to avoid the consequences of his criminal conduct. She relayed,

> One night we were sitting in his couch watching TV and he was telling me . . . that I needed to sign it or we needed to do this and that he was sorry for what he had done to get us into this trouble [for] bribing the judge, and he was in trouble with this investigator[.] . . . He sat on the couch telling me this, bawling his eyes out, saying he may go to jail and and I said, Craig, I will stick with you and he said, I will wrap myself around a tree before I ever go to jail. It will kill my mother. Those were his exacts words.

N.T., 1/29/15, at 37-38. Wife did not understand how the settlement agreement would help Husband avoid criminal liability, but she believed Husband and signed the agreement to protect their assets if he did go to jail for bribery. *Id*. at 40.

---

[7] There is no evidence that Husband actually bribed a judge, and at this point, Wife does not assert that Husband was involved in any crime. Instead, Wife contends that she believed Husband's yarn about bribing a judge and signed the settlement agreement as a result of that misrepresentation.

In support of her allegations of duress, Wife introduced text messages that she characterized as evincing Husband's haste to execute the agreement in anticipation of the bribery investigation. Those missives include an August 29, 2011 text that Wife received at 11:34 a.m., "I have the new docs[.] [W]e need to get these filed we cannot afford the exposure[.]" N.T., 1/29/15 at Exhibit 12. Husband followed up that message at 10:51 p.m. that night, "I am sorry I wish it was different I did what I did and can't undo it[,] there [is] too much at stake to not do it[.]" *Id*. The following day, Husband texted, "[Why] don't [you] come down after [eight.] We can talk. I have an idea[.] [B]attery dying [and no] charger[.] [I]f [you] [are] there[,] I will see you then[.]" *Id*. Finally, on the evening of September 6, 2011, one week prior to the settlement agreement, Husband implored, "Just sign the agreement so [you] don't lose everything[.] [Y]ou don't have the courage to deal with her so let her win[.] I will deal with her." *Id*.

Wife asserts that the texts demonstrate Husband's misrepresentation regarding his alleged bribery of a trial court judge. She contends that the purpose of the misrepresentation was to induce her into signing the accord, which she thought was a legal gambit to protect their joint assets from seizure. Wife continues that, despite the unambiguous language of the property settlement agreement that a no-fault divorce was imminent, the parties were still romantically involved, and Husband assured her that the

purpose of the agreement was to protect their future together rather than divide the property in a divorce. She contends that she believed Husband's story and felt that signing the agreement was the only option.

Husband counters that Wife's fanciful allegation of his alleged bribery scheme is unsubstantiated by documentary evidence or corroborating testimony. He further asserts that, even if Wife could establish that he knowingly made a material representation with the intent of inducing her to sign the agreement, Wife cannot rely upon the purported misrepresentation where, as here, she had sufficient opportunity to discover the truth about the bizarre bribery yarn but failed to do so. Indeed, as Husband observed, Wife neglected to make any effort to obtain documentation that would substantiate any aspect of her claim.

The salient legal principle follows:

> In order to void a contract due to a fraudulent misrepresentation, the party alleging fraud must prove, by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance. All of these elements must be present to warrant the extreme sanction of voiding the contract.

***Porreco v. Porreco***, 811 A.2d 566, 570-71 (Pa. 2002) (citation omitted).

In rejecting Wife's contention, the trial court determined that the record did not support her assertion that Husband crafted the falsehood in

order to coerce her into signing the agreement. Essentially, the court reasoned, albeit implicitly, that Husband did not make a material representation with the intent of misleading Wife to act. Thus, Wife failed to satisfy the test outlined in **Porreco**, **supra**, in order to invalidate an agreement due to fraudulent misrepresentation. Again, the trial court made a credibility determination in favor of Husband, and since the record supports that determination, we will not disturb it. **Mackay**, **supra**, at 533.

Finally, having sustained the trial court's credibility determinations, we reject Wife's related claim that the trial court erred in declining Wife's request for equitable reimbursement alimony based upon Husband's alleged dissipation of the 401(k) account.[8] Moreover, as the trial court accurately stated, "even if the agreement is voided, there is no reason to believe that [Wife] would be entitled to additional funds. Given the assets actually available to the parties, the agreement provided [Wife] with substantial financial benefits." Trial Court Opinion, 9/28/15, at 6. Recall that Wife accepted Husband's agreement to pay her mortgage, real estate taxes, utility bills, auto and home owner's insurance, for a period of five years from the date of the accord. The certified record demonstrates that Husband fulfilled this obligation. In light of these financial benefits that Wife received

---

[8] This claim was listed as Wife's third question presented for review.

in addition to the division of marital property, we find no basis to disturb the

trial court's determination that equitable alimony is not warranted.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2016