## Half v. Metropolitan Life Insurance Co.

248

C.P. of Allegheny County, no. GD95-17631, GD95-15437, GD95-9028, GD95-16273, GD95-17627, GD95-15438, GD94-10543.

*Kenneth R. Behrend,* for plaintiff.
*William M. Wycoff, Kimberly A. Brown* and *Kevin P. Allen,* for defendant Metropolitan Life Ins. Co.
*Richard F. Rinaldo,* for defendant Manufacturers Life Insurance Co.
*John B. Ciptak,* pro se.
*Clare M. Bello,* for defendant agents.
*Dennis Lewis,* for defendant Antonino.

WETTICK, *J.,* December 8, 2003—

## INTRODUCTION

There are more than 200 lawsuits pending in this court involving alleged improper sales practices of insurance companies. The parties selected seven "test cases" that would be initially tried.

In these seven cases, discovery has been completed and pretrial statements have been filed. In this opinion, I consider motions for summary judgment filed by defendants in each of the seven cases and motions for partial summary judgment filed by plaintiffs in most of the seven cases.

## I.

*Half v. Metropolitan Life Insurance Company et al.*

Metropolitan Life Insurance Company's motion for summary judgment seeking dismissal of each of plain-

tiff's causes of action and plaintiff's motions for partial summary judgment are the subjects of part I of this opinion.

On the basis of the evidence construed in a manner most favorable to plaintiff, the facts are as follows:

Plaintiff purchased a MetLife insurance policy in 1946 when he was 36 years old. The policy was a 20-year limited payment policy with a face amount of $10,000. (Amended complaint, exhibit 2.) As of December 10, 1989, the value of the policy was approximately $21,300. (Plaintiff's exhibits, ex. 4 at 4.)

In 1990, a MetLife representative requested plaintiff to meet with him to discuss a truly exceptional offer. At that time, plaintiff (then almost age 80 and now age 93) was not actively seeking to increase his life insurance or to replace his 1946 policy which was growing in value. (Plaintiff's exhibits, ex. 1, Howard Half deposition 9/15/97, T. 13-14.)

The sales representative informed plaintiff that he could convert his 1946 policy into a $50,000 Flexible-Premium Life Policy. (Amended complaint, ex. 3.) Because of the amount of accumulated funds in the 1946 policy, plaintiff would never need to make any out-of-pocket premium payments in connection with the conversion of his life insurance policy to $50,000. The insurance representatives told plaintiff that he might receive documents from MetLife indicating that premiums were due. However, this was a bookkeeping process that he should disregard. (T. 14, 20.)

The information that the sales representatives furnished plaintiff was not true.[1] At the time of the purchase,

---

1. As of June 15, 1990, a gross payment from the 1946 policy of approximately $19,000 was paid into the $50,000 policy. The money

MetLife's rate of interest was 8.25 percent.[2] Even if this rate of interest was sustained, the $50,000 policy would have expired as of age 89 unless additional premium payments were made.[3] See the initial annual statement which plaintiff received for the period ending January 10, 1991:

"Expiry Information

"If No Payments Are Made, Your Policy Will End On The Following dates: Assuming guaranteed interest and maximum cost of insurance rates = 06/1995 Assuming current rates = 01/1999

"If modal premiums are paid, your policy will end on the following dates: Assuming guaranteed interest and maximum cost of insurance rates = 12/2001"

Plaintiff testified that he did not realize that the policy he received would not be funded in the manner which the sales representatives represented, until he saw newspaper articles in 1994 talking about promises made by

---

in the 1946 policy would have increased each year until plaintiff's death without plaintiff making any additional payments had the policy not been terminated. The cost of the $50,000 policy reduced the existing cash value by thousands of dollars each year. Furthermore, the cost to maintain the flexible premium life policy increased each year because the cost to plaintiff each year is based on the likelihood that persons who are plaintiff's age will survive for at least an additional year. For example, when plaintiff was 81, his cost for that year was based on the annual survival rate of males who are 81 while his cost when he was 86 was based on the annual survival rate of males who are 86.

2. For the first year of the policy, the interest rate fluctuated between 8.25 percent and 8.0 percent. (MetLife's motion, ex. F. at 3.)

3. The $50,000 policy, in fact, exhausted the resources of the 1946 policy in June of 1998 (ie. at 33).

insurance companies that were inconsistent with the provisions of the policies. (T. 22.)

Through an unsolicited July 16, 2001 letter to plaintiff, MetLife guaranteed a death benefit of $50,000 under the policy at no further cost to the policyholder.[4] (MetLife's motion, ex. I.)

Plaintiff's amended complaint has six counts: Count I, fraud and deceit; Count II, negligence (breach of duty to provide full and correct information); Counts III and IV, violations of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 et seq.; Count V, breach of implied covenant of good faith and fair dealing; and Count VI, negligent supervision. Plaintiff's second amended complaint contains the following counts relating to the deferred acquisition cost tax (DAC tax): Count I, fraud and deceit; Count II, negligence/willful disregard; Count VII, bad faith based on the Unfair Insurance Practices Act, 40 Pa.C.S. §1171.5 and the Bad Faith Statute, 42 Pa.C.S. §8371; and Count VIII, breach of contract and implied covenant of good faith and fair dealing.

Initially, I consider the fraud claims raised in Count I of plaintiff's amended complaint based on the representations of the sales representatives that a new $50,000 policy could be purchased with the accumulated cash value in the 1946 policy. MetLife seeks dismissal on the following grounds: the statute of limitations, the parol evidence rule, the absence of justifiable reliance, and the absence of any damages.

---

4. I am denying plaintiff's motion for partial summary judgment because the guarantee is not an admission of liability.

I initially consider the statute of limitations defense. Fraud claims are governed by a two-year limitation period and this lawsuit was not filed until more than five years after the fraud. Plaintiff relies on the doctrine of fraudulent concealment.

The legal standards governing the doctrine of concealment are set forth in my November 7, 1994 memorandum entered in *Old Republic Insurance Co. v. ARA Services Inc.,* no. GD90-12590 (C.P. Allegheny 11/7/94). (MetLife's master appendix vol. II ex. 36 at 19-22.) These pages 19-22 follow as pages 253-55 of this opinion:

"Old Republic, however, relies on an alternative tolling principle—the doctrine of fraudulent concealment. Under this doctrine, the limitation period is tolled if the plaintiff, instead of conducting an independent inquiry, relies on misrepresentations which the plaintiff reasonably believes to be true. See *Molineux v. Reed,* 516 Pa. 398, 402-403, 532 A.2d 792, 794 (1987):

"The governing principles relevant to the establishment of a claim of estoppel based on fraud or concealment are as follows. Where, 'through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry,' the defendant is estopped from invoking the bar of the statute of limitations. *Schaffer v. Larzelere,* 410 Pa. 402, 405, 189 A.2d 267, 269 (1963). Moreover, defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient. *Walters v. Ditzler,* 424 Pa. 445, 227 A.2d 833 (1967); *Nesbitt v. Erie Coach Company,* 416 Pa. 89, 204 A.2d 473 (1964). Mere mistake, misunderstanding or lack of knowledge is insufficient however, *Schaffer v. Larzelere, supra;* and the burden of prov-

ing such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party. *Nesbitt v. Erie Coach Company, supra.*"

"In *Silverman v. Bell Savings & Loan Association,* 367 Pa. Super. 464, 533 A.2d 110 (1987), the court rescinded the sale of property because the seller falsely represented to the buyer that the zoning ordinances permitted the back portion of the property to be used for commercial parking. The court rejected the argument that reliance on the representation was not justified because the purchaser (an attorney and an experienced real estate investor) could have easily verified the zoning status of the property prior to consummating the sale. The court quoted the Restatement (Second) of Torts §541, comment a, which states that a recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity by investigating its truth unless the recipient 'blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.' *Silverman v. Bell Savings,* 367 Pa. Super. at 474, 533 A.2d at 115.

"The evidence most favorable to Old Republic supports its claim that through fraud and concealment defendants caused Old Republic to relax its vigilance and to deviate from its right of inquiry. Consequently, Old Republic's claims are not barred by the statute of limitations because it was possible for Old Republic to have discovered defendants' fraud if it had diligently investigated the truth of defendants' representations shortly after they were made.

"The next issue is when a defendant, once estopped, may invoke the statute of limitations. The parties have not

cited and I have not found any Pennsylvania appellate court case law that has explicitly addressed this issue. I find to be persuasive the analysis of Pennsylvania case law which the Court of Appeals for the Third Circuit made in *Urland v. Merrell-Dow Pharmaceuticals Inc.,* 822 F.2d 1268 (3d Cir. 1987), and *Sheet Metal Workers, Local 19 v. 2300 Group Inc.,* 949 F.2d 1274 (3d Cir. 1991). The standard continues to be reasonable diligence. Fraud tolls the statute until 'the effects of the fraud have been nullified by knowledge by the plaintiff.' *Id.* at 1281, quoting *Urland,* 822 F.2d at 1273. The statute is tolled until there is 'some reason to awaken inquiry and direct diligence in the channel in which it would be successful,' *Urland,* 822 F.2d at 1273, quoting *Deemer v. Weaver,* 324 Pa. 85, 88, 187 A. 215, 216 (1936). The statute begins to run when the plaintiff has acquired information that would cause a reasonably diligent person in the plaintiff's position to no longer rely on the defendant's representations."

MetLife contends that the misrepresentation claims must be dismissed because plaintiff would have learned of the misrepresentations if he read the entire insurance policy. MetLife also contends that these claims must be dismissed because plaintiff would have discovered that the policy would expire unless additional premiums were paid, by reading the entire June 10, 1991 annual statement. (MetLife's motion, ex. F.)

Plaintiff's response is that MetLife was a well-established and reputable company. Consequently, it was reasonable for him to rely on statements of its representatives.

As I said in *Old Republic,* the issue is whether plaintiff had sufficient information to cause him to believe

that he should no longer be relying on the representations of the sales agents. Insurance policies are intimidating to those who are not extremely sophisticated investors. Thus, I do not find that, as a matter of law, plaintiff's failure to read the entire insurance policy or annual statement, constituted a blind reliance on a misrepresentation, the falsity of which would have been "patent" to plaintiff "if he had used his opportunity to make a cursory examination or investigation." *Silverman v. Bell Savings,* 367 Pa. Super. at 474, 533 A.2d at 115.

The obligation to make a cursory examination may mean that plaintiff should have looked at the cover sheets of the insurance documents to determine what is being sent. However, nothing in the cover sheets puts plaintiff on notice that the MetLife representatives had misrepresented the terms of the policy. Set forth below are copies of the cover sheets of the insurance policy provided to plaintiff (amended complaint, ex. 3) and of the annual statement mailed to plaintiff. (MetLife's motion, ex. F.) [Not published herein.] Neither cover sheet puts plaintiff on notice that the $50,000 insurance which he purchased might end prior to his death unless he paid additional premiums.

I next consider MetLife's contention that the misrepresentation claims must be dismissed because plaintiff could not have reasonably relied on the representations of the sales representatives. According to MetLife, there cannot be a finding that plaintiff reasonably relied on the representations of MetLife's representatives because he was provided with an insurance policy (which he could revoke) that contradicted the alleged representations of the sales representatives. Also, paragraph 2 on page 6 of plaintiff's signed application for the $50,000 insurance

policy (MetLife's motion, ex. D at 3179399-6) as well as a provision in the insurance policy (amended complaint, ex. 3 at 11) state that sales representatives cannot create binding contracts of insurance.

I reject this argument because a party may rely on representations of another party even though the party relying on these representations is in a position to further investigate to determine the accuracy of the representations. *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 288, 285 A.2d 451, 455-56 (1972); *Silverman v. Bell Savings and Loan Association,* 367 Pa. Super. 464, 474, 533 A.2d 110, 115 (1987); Restatement (Second) of Torts §540 cmt. a. A recipient of a false representation is justified in relying on its truth unless the falsity of the representation is obvious to the recipient. Restatement (Second) of Torts §541.

Next I address MetLife's contention that the misrepresentation causes of action should be dismissed because of the parol evidence rule. The $50,000 insurance agreement contains an integration clause. (Amended complaint, ex. 3 at 11.) As stated previously, it also provides that no sales representatives may make any binding promises about policy benefits. *(Id.)*

At oral argument, I asked counsel for MetLife if it was MetLife's position that the parol evidence rule bars a court from considering any misrepresentations regardless of the extent to which they were deliberately designed to confuse and mislead the persons to whom MetLife's representatives were attempting to sell insurance. Was every purchaser of insurance—regardless of what he or she was told or his or her lack of sophistication—responsible for reading the insurance policy? MetLife's response was that this is the law of Pennsylvania.

This may be the law in commercial transactions. See *1726 Cherry Street Partnership v. Bell Atlantic Properties Inc.,* 439 Pa. Super. 141, 653 A.2d 663 (1995); *HCB Contractors v. Liberty Place Hotel Associates,* 539 Pa. 395, 652 A.2d 1278 (1995). However, in consumer transactions, the parol evidence rule does not automatically shield a party from the consequences of his or her fraud. For example, the parol evidence rule has not been strictly applied in sales of residential real property where oral representations were made regarding the condition of the property. *LeDonne v. Kessler,* 256 Pa. Super. 280, 389 A.2d 1123 (1978).

Also, the parol evidence rule does not necessarily bar an insured from pursuing a claim based on the statements of an insurance representative which are inconsistent with provisions of the insurance policy.

In *Pressley v. Traveler's Property Casualty Corporation,* 817 A.2d 1131 (Pa. Super. 2003) (a case which involved only a negligent misrepresentation), the insurance agent represented to the daughter that her mother could be immediately added to the daughter's policy, and that her mother would have the same coverage. The daughter's policy provided for underinsured coverage of $305,000. The agent assumed the mother lived with the daughter and never asked. The mother did not live with the daughter; consequently, the clear language of the insurance policy contradicted the insurance agent's representation. The daughter never read the policy. The insurance company argued that the daughter was not entitled to rely on the statements of the insurance agent where she had received the policy that, if read, would have made it clear that her mother would not have the same coverage.

The Superior Court ruled that the daughter was entitled to rely on the agent's representations. The court cited *Tonkovic v. State Farm Mutual Auto Insurance Co.,* 513 Pa. 445, 521 A.2d 920 (1987), for the proposition that where an insured did not receive the requested coverage, the reasonable expectation of the insured is the focal point of the insurance transaction. The court also quoted from the opinion of Justice Manderino in *Rempel v. Nationwide Life Insurance Co.,* 471 Pa. 404, 370 A.2d 366 (1997), that it is not unreasonable for consumers to rely on representations of the expert rather than on the contents of the insurance policy itself, and that a policyholder has no duty to read the policy unless under the circumstances it is unreasonable not to read it.[5]

For these reasons, I conclude that plaintiff's tort claims are not necessarily barred by the parol evidence rule.

MetLife next contends that plaintiff's misrepresentation claims should be dismissed because plaintiff has received the benefit of the bargain. Plaintiff's claim is that sales representatives stated that if plaintiff signed the paperwork which they proposed, he would have a $50,000 insurance policy payable at his death. This is what he eventually received through the July 16, 2001 letter from MetLife guaranteeing a death benefit under the policy of $50,000 at no further cost to the policyholder. Consequently, he has no damages.

However, in MetLife's brief in opposition to plaintiff's motion for partial summary judgment at 2 n.2, MetLife states: "It is beyond dispute that other than a

---

5. Six members of the court participated in the decision of the case. Two members joined Justice Manderino's opinion. Three justices concurred in the result only.

single additional payment of $379, plaintiff has not any more than he claims he expected to pay." (See also, MetLife's motion, ex. A at 33.) Also, there is a claim for punitive damages. MetLife has not offered any reason why plaintiff cannot pursue these claims.

Plaintiff's claims under the Consumer Protection Law are based on the misrepresentations of the MetLife representatives. I am overruling the motion for summary judgment as to violations of the Consumer Protection Law for the same reasons that I have overruled the motion as to the fraud claims.

I am dismissing Count V—breach of implied covenant of good faith and fair dealing—because Pennsylvania does not recognize a separate cause of action for such breaches. *Ihnat v. Pover,* 146 P.L.J. 299, 316-17 (1997); *Heritage Surveyors v. National Penn Bank,* 801 A.2d 1248, 1253 (Pa. Super. 2002); *Creeger Brick and Building Supply Inc. v. Mid-State Bank and Trust Co.,* 385 Pa. Super. 30, 560 A.2d 151 (1989).

Plaintiff has alleged, and MetLife states in its brief, that the insurance representatives were acting within the scope of their duties with MetLife. Consequently, MetLife is bound by their actions. MetLife's liability is limited to the tortious conduct of these agents. Thus, I am dismissing plaintiff's negligent supervision claim raised in Count VI. *Ihnat v. Pover,* 146 P.L.J. 299, 317-18.

I next consider MetLife's motion for summary judgment as to the counts raised in the second amended complaint which are characterized as the DAC tax scheme.

Plaintiff's life insurance policy provided that the cost of the insurance for any policy month is equal to the amount of insurance multiplied by the monthly insur-

ance rate. The monthly rates will be "based on the insured's age, sex and underwriting class."

In 1990, Congress passed legislation requiring insurance companies to amortize over a 10-year period 7.7 percent of the premiums collected from the policyholders. In 1992, MetLife increased the cost of insurance to recover its DAC tax expenditures from existing policyholders. MetLife sent its policyholders letters or premium notices informing them that the cost of insurance would be increased due, at least in part, to increased federal taxation, and that this was authorized by their policies.

In Count I, plaintiff contends that MetLife fraudulently failed to disclose that it was not allowed to charge policyholders the DAC tax which it was charging on universal life policies. Count II is a negligence-willful disregard cause of action based on the same allegations. For purposes of considering MetLife's motion for summary judgment as to these counts, I will assume that plaintiffs are correct that MetLife breached its contractual obligation to its policyholders by imposing this charge.

I am dismissing both of these causes of action. Under Pennsylvania case law, a plaintiff cannot convert a breach of contract claim into a fraud claim simply by alleging that the party knowingly engaged in conduct which breached the contract.[6] *Etoll Inc. v. Elias/Savion Advertising Inc.,* 811 A.2d 10 (Pa. Super. 2002).

Count VIII is a cause of action for breach of contract for imposing charges that the insurance agreement did not permit. On the basis of the record of these proceed-

---

6. Also, the paragraphs in the second amended complaint, 13 through 19, which comprise Counts I and II were stricken by order of court. (*Ihnat v. Pover,* GD94-17465 (C.P. Allegheny 2/6/03).)

ings, I cannot determine whether MetLife breached its agreement with plaintiff by imposing additional charges based on the DAC tax. Consequently, I am denying MetLife's motion for summary judgment as to this count.

Count VII is a bad faith claim based on 42 Pa.C.S. §8371.[7] This legislation may apply if it is determined that the imposition of additional charges based on the DAC tax violated the contract and that the insurance company has no plausible justification for imposing these additional charges. Consequently, I am denying MetLife's motion for summary judgment as to this claim.

## II.

### Donahue v. Metropolitan Life Insurance Company et al.

The motions of MetLife and George R. Weber for summary judgment seeking dismissal of each of plaintiff's causes of action and plaintiff's motion for partial summary judgment are the subjects of part II of this opinion.

Plaintiff's amended complaint raises causes of action for common-law fraud and deceit (Count I); negligence (Count II); violations of the Consumer Protection Law (Counts III and IV); and negligent supervision (Count V). Plaintiff's second amended complaint (based on

---

7. In *Ihnat v. Pover,* 146 P.L.J. 288, 291-98 (1997), I ruled that section 8371 is not restricted to lawsuits based on an insurance company's failure to pay a claim. There is no merit to MetLife's contention that recent appellate court case law (*Booze v. Allstate Insurance Co.,* 750 A.2d 877 (Pa. Super. 2000) and *Adamski v. Allstate Insurance Co.,* 738 A.2d 1033 (Pa. Super. 1999)) has limited section 8371 to the failure to pay a claim under the policy.

charges for the DAC tax) raises causes of action for common-law fraud and deceit (Count I); negligence/willful disregard (Count II); bad faith (Count VI); and breach of contract (Count VII).[8]

On the basis of the evidence construed in a manner most favorable to plaintiff, the facts are as follows:

As of April 1990, plaintiff (age 73) was insured by three MetLife policies. The oldest, acquired in 1941, provided a death benefit of $1,181, the next provided a death benefit of $4,000 (a 1954 policy), and the newest (a 1975 policy) provided a death benefit of $10,000. (Amended complaint, ex. 3, 2 and 4.) Plaintiff was paying an annual premium of $597.50 on the $10,000 policy. No premiums were due on the other policies. (Amended complaint ¶29.)

As of July 1, 1989, the oldest policy provided additional insurance of $1,108.39 for a total insurance amount of $2,289.39; as of January 1, 1990, the policy with a face value of $4,000 provided additional insurance of $4,949.13 for a total insurance amount of $8,949.13; and as of May 26, 1991, the $10,000 policy provided additional insurance of $5,157.01 for a total insurance amount of $15,157.01. (Exhibits to plaintiff's brief in support of plaintiff's response to defendants' motion for summary judgment, ex. 26 at 3-5.)

In April 1990, defendant George R. Weber, a MetLife representative, contacted plaintiff. He informed plaintiff that plaintiff could increase the face amount of his life insurance from $15,181 to coverage of $50,000 in the

8. Counts I and II were stricken by order of court, *Ihnat v. Pover,* GD94-17465 (C.P. Allegheny 2/6/03).

first year and coverage of $40,000 thereafter for $600 per year. This would be an increase of only $2.50 per year over what plaintiff was already paying. (Amended complaint ¶¶31, 36; defendant George R. Weber's motion for summary judgment, ex. A, Donahue deposition T. 35.)

Mr. Weber advised plaintiff that the money in the new policy would earn the same or better interest and increase at the same rate as the money increased in his old policies. He also advised plaintiff that if he surrendered his existing policies and allowed their proceeds to be deposited into the new policy, no payments would ever be needed other than the annual payment of $600. (Amended complaint ¶¶32-33, 36; T. 32-33, 35-36, 95, 124.)

Mr. Weber signed the application for this insurance on April 28, 1990. The policy was dated May 24, 1990 and delivered after July 1990. (Amended complaint, ex. 6.) Plaintiff states that he never looked at the policy until 1994. (T. 121.)

Mr. Weber's representation that the $600 payment coupled with the money in the existing policies would pay for the new insurance policy was false. See for example, the May 1991 annual statement (Expiry Information) which provides that if modal premiums are paid, your policy will end on December 1997 assuming guaranteed interest and maximum cost of insurance rates and December 1999 assuming current rates. (Defendant MetLife's motion for summary judgment, ex. D at 42.) Also, the new policy is not eligible for dividends. (*Id.,* ex. A at 1.)

On July 16, 2001, a vice-president of MetLife sent plaintiff's counsel a letter advising plaintiff that MetLife

unconditionally guaranteed that it would provide a death benefit in the face amount of $40,000 at a cost to the policyholder of $600 per year until the final date of the policy. (MetLife's motion for summary judgment ex. G.) Plaintiff died on February 17, 2002. (Suggestion of death of plaintiff James J. Donahue.) His wife has been paid the death benefits provided for in the 1990 policy. (MetLife's amended motion for summary judgment, ex. I.)

Mr. Donahue went to tenth or eleventh grade. He was employed in various service-related occupations, including as a box factory worker, a railroad worker, a water company worker, and a furnace installer. He retired in 1968. (T. 6-10.)

This case is similar to *Half v. Metropolitan Life Insurance Company.* Consequently, I make the same rulings.

### III.

### Kresovich v. Metropolitan Life
### Insurance Company et al.

The motions for summary judgment of MetLife and J. Joel Sherman seeking dismissal of each count in plaintiffs' amended complaint are the subjects of part III of this opinion.[9]

Plaintiff-husband worked as a steelworker with U.S. Steel for approximately 38 years until he retired in 1983.

---

9. Plaintiffs filed a second and third amended complaint. According to MetLife's brief and Mr. Sherman's motion, I previously ruled that these complaints do not apply to MetLife or Mr. Sherman. (MetLife's brief in support at 3 n.1; Sherman motion at 3 ¶9; *Kresovich v. Metropolitan Life,* G.D. 95-9028 (Allegheny 7/25/02 court order).)

He was a laborer for 20 years and was then promoted to the position of foreman. (Plaintiffs' exhibits, ex. 1, George Kresovich dep. T. 8.)

On February 17, 1950, plaintiff-husband purchased a MetLife whole life policy with a face value of $2,000. (Amended complaint ¶34.)

Plaintiff-husband's retirement in 1983 terminated $120,000 of term insurance provided through U.S. Steel's group plan. (T. 19.) Plaintiff-husband still had, through his employment, $80,000 of life insurance. Beginning in 1987, this would be reduced by $6,000 each year until 1994, leaving him with only $32,000 coverage for the remainder of his life. (T. 20.)

In late 1983, plaintiff-husband met with defendant Gary Antonino, an agent of MetLife, who recommended that he purchase a $75,000 universal life policy with a monthly premium of approximately $150 a month. He advised plaintiff-husband that this was better than term life insurance because he could accumulate money to fund the policy. (T. 25-27.)

Mr. Antonino later told plaintiff-husband that the premium would be $177.05 per month. (T. 30.) Plaintiff-husband purchased the policy. The policy was issued on December 26, 1983. (Amended complaint, ex. 1 at 3.)

In 1987, plaintiff-husband advised Mr. Antonino that he wanted to increase his life insurance coverage to offset the yearly $6,000 reductions. Mr. Antonino proposed that plaintiff-husband purchase a new $25,000 whole life insurance policy. Mr. Antonino told plaintiff husband that this policy would be fully funded by premium payments of $140.50 per month for seven years. (T. 47-49.)

Mr. Antonino directed plaintiff-husband to discontinue his monthly payments on the $75,000 policy (T. 47-48) and to transfer the funds in the 1950 policy into the $75,000 policy. (T. 91, amended complaint, ex. 2.) Mr. Antonino advised plaintiff-husband that he did not have to pay premiums on the $75,000 policy for the next seven years until the $25,000 was fully paid. Plaintiff-husband followed Mr. Antonino's recommendations. The $25,000 policy was issued on March 1, 1987. (Amended complaint, ex. 4.)

The information that Mr. Antonino furnished was not true. The $25,000 policy would not be fully funded within seven years and plaintiff-husband would not keep the $75,000 policy if he did not make any payments on the policy for these seven years and began making premium payments again in the eighth year.

This case also involves the claims of Mildred Kresovich, the wife of George Kresovich. In 1950, she purchased a $1,500 whole life policy. (Amended complaint, ex. 5.) In 1970, she had paid the required 20 years premium payments. (Sherman's motion for summary judgment, ex. C, 10-4-00 Mildred Kresovich deposition, T. 9.) In 1990, defendant Jeffrey Joel Sherman, a MetLife representative, represented that Ms. Kresovich could purchase a $25,000 universal life policy if she would pay $30 per month and deposit the proceeds from her 1950 policy into this new policy. Ms. Kresovich did so. The policy was issued on April 5, 1990. (Amended complaint, ex. 6.)

The representation that annual payments of $360 would be sufficient to purchase the $25,000 policy was based on extremely optimistic and unrealistic projections

of interest and dividend rates. A premium of $360 will not fund the policy but, instead, plaintiff-wife will be required to pay substantial amounts of additional premiums to keep the policy from lapsing since the cost of insurance rises as plaintiff-wife grows older. (T. 23-28.)

Neither plaintiff learned of the misrepresentations until 1994 when they met with another MetLife sales representative. (George Kresovich dep. T. 100; Mildred Kresovich dep. 10/4/00 T. 23.)

Both plaintiffs raise the following causes of action: fraud and deceit; negligence; violations of the Consumer Protection Law; and negligent supervision.

I am granting the motion for summary judgment of Mr. Sherman as to any claims that plaintiff-husband has raised. There is no evidence that Mr. Sherman was involved in any of the insurance transactions of plaintiff-husband.[10]

I am not granting summary judgment as to Mr. Sherman for the insurance transaction involving plaintiff-wife. She testified that Mr. Sherman delivered the policy. At that time, Mr. Sherman had plaintiff-wife sign a form requesting that the plan premium be changed from $800 per year to $360 per year based on Mr. Sherman's representations that the cash surrender of her 1950 policy and the annual payment of $360 would keep her policy in effect.

This case is similar to *Half v. Metroplitan Life Insurance Company.* Consequently, I make the same rulings.

---

10. Gary Antonino is in bankruptcy.

IV.

*Drelles v. Metropolitan Life*
*Insurance Company et al.*

Mr. Sherman's motion for summary judgment seeking dismissal of all claims raised against him in the complaints filed at GD95-16273 and GD96-14270, and the motion for summary judgment of MetLife seeking dismissal of all claims raised against it in the complaint filed at GD95-16273 are the subjects of part IV of this opinion.

This lawsuit arises out of the sale of life insurance policies in 1988 and 1990 to an extremely sophisticated investor.

Mr. Drelles majored in finance in college and obtained a master's degree in Business Administration. (T. 7.) He was employed for approximately 25 years at Pittsburgh National Bank. (T. 7-8.) From 1952 to 1959, he was a research analyst; from 1961 to 1965, he was the director of Equity Research; from 1965 to 1971, he was the director of Investment Research and Investment Strategies; from 1972 to 1978, he was a vice president responsible for all investment functions. (Sherman motion, ex. E.) During the 1960s and into the early 1970s, he supervised eight or nine analysts. (T. 19.) His responsibilities included making recommendations to the investment committee as to what percentage of the portfolio should be in stock (and what kind of stock) and what percentage should be in fixed incomes. (T. 12-14.) Thereafter, he was responsible for the investment functions of the entire trust department. The trust department held five billion dollars of trust assets, and he was in charge of the

investment department staff of 60 people, including 25 investment professionals. (T. 18.)

In the middle of his career at Pittsburgh National Bank, Mr. Drelles spent approximately two years as a general partner with a stock brokerage firm. (T. 19-20.)

From 1978 to 1982, he was the director of pension assets management at Eastern Airlines. This was a pension plan for 40,000 employees. It had assets of approximately $300 million. He was the chief advisor to the pension committee about investing the assets of the plan. (T. 29-30.)

From 1982 to 1986, he was executive vice president of Bessemer Trust Company. This company managed the financial affairs of very wealthy people. Mostly, he was involved in the valuation and selection of common stocks. (T. 37-38.)

From 1986 to 1989, he was a senior vice president of Pitcairn Inc. He primarily managed personal trusts and investments of the Pitcairn family. (T. 41.)

In 1989, he became president of Fostin Investment Management Company. He bought and sold stocks for the Foster family. (T. 45.)

In May 1988, Mr. Drelles (age 59) met with Mr. Sherman (a MetLife representative) to discuss life insurance. At that time, Mr. Drelles owned two five-year Renewable or Convertible Term life insurance policies: a 1957 policy with the face amount of $50,000 and a 1961 policy with a face amount of $50,000. (Complaint at GD95-16273 ¶23.) Eventually, he purchased a whole life policy in the amount of $100,000. The policy was issued on June 14, 1988. (Complaint at GD95-16273, ex. F.) Mr. Drelles testified that he received a copy of the

policy but did not review it. (J. Joel Sherman's motion for summary judgment, ex. A; S. Drelles deposition 11/8/00, T. 96.)

Mr. Drelles testified that he purchased this whole life policy based on Mr. Sherman's representations that upon payment of $4,092 per year for eight years, he would have a fully paid policy. Mr. Sherman represented that if Mr. Drelles made these payments, MetLife was obligated to pay $100,000 to his beneficiary upon his death. He was told that he would not have to pay additional premiums under any circumstances. (T. 82, 91.) Mr. Drelles testified that he was not aware that this policy (and a subsequent policy I will discuss) would accumulate value and that future premiums would be paid with accumulated dividends. (T. 89-90.)

The representation, that MetLife was obligated to pay $100,000 to Mr. Drelles' beneficiary upon his death if he made annual payments of $4,092 for eight years, is inconsistent with the provisions in the insurance policy. The premium schedule set forth in the policy provides for a monthly premium of $369 payable for 41 years. (Complaint at GD95-16273, ex. F at 3 (cont'd).)

Mr. Drelles also testified that he never followed up on any illustrations that Mr. Sherman provided. (T. 156.) If Mr. Drelles had examined either the illustrations or the policy, he would have seen that the policy would accumulate value and that it was the accumulated value (if interest rates were sufficiently high) that would pay the premiums in later years.

This litigation also involves a second policy. Subsequently, Mr. Drelles approached Mr. Sherman about purchasing additional insurance. In 1990, Mr. and Ms.

Drelles purchased a life insurance policy in the amount of $500,000 payable on the second death. The policy was issued on April 12, 1990. (Complaint at GD95-16273, ex. K.) Mr. Drelles testified that he received a copy of the policy in May or June of 1990. He "looked at" the policy. (T. 166.)

Mr. and Ms. Drelles testified that they purchased the policy on the basis of Mr. Sherman's representations that the policy would be fully paid if they made annual payments of approximately $6,700 for 10 years. (T. 137, 139.)

At meetings with plaintiffs before they purchased the policy, Mr. Sherman was accompanied by a second person whom plaintiffs believed to be a MetLife representative. He advised plaintiffs that he had a law degree; he offered estate planning advice. (T. 113-14.) He told plaintiffs that proceeds from the policy would not be included in their estates for federal inheritance tax purposes. (T. 116-17.) Plaintiffs contend that these representations regarding the tax consequences of the benefits are incorrect; the insurance proceeds will be included in the survivor's estate.

The representation that the policy would be fully paid with annual payments of $6,700 for 10 years is inconsistent with the provisions within the policy that annual premiums are payable to the second death or to age 99 of the younger of the survivors.

The complaint at GD95-16273 is a six-count complaint: Count I—fraud and deceit; Count II—negligence; Counts III and IV—violations of the Consumer Protection Law; Count V—negligent supervision; and Count VI—breach of the implied covenant of good faith and fair dealing. Mr. Drelles is the only plaintiff and his claims

are based on the sales of both policies. The complaint at GD96-14270 is also a six-count complaint raising the same causes of action. Mr. and Ms. Drelles are the plaintiffs. All claims are based solely on the sale of the 1990 policy.

The causes of action relating to the 1988 policy involve wrongdoings occurring prior to the issuance of the policy. The lawsuit seeking recovery based on these wrongdoings was filed more than six years after the alleged wrongdoings. The statutes of limitations governing the six counts of the 1995 lawsuit require that the suit be instituted within six years as to certain counts and within a shorter time for the remaining counts. I am dismissing all claims raised against both defendants in the 1995 action on the ground that they are barred by the relevant statutes of limitations.

Mr. Drelles contends that the statutes of limitations have been extended through the discovery rule and the concealment doctrine. I disagree. Plaintiff received a copy of the 1988 policy more than six years before suit was filed. He only needed to briefly review the policy to determine that he had not entered into a transaction in which MetLife had promised to pay $100,000 upon his death in exchange for his making eight annual payments in the amount of $4,092. He would have seen that he had, instead, purchased a standard whole life policy which would produce dividends that could be used for several purposes including payment of premiums.[11]

---

11. Under the heading *"Payments during insured's lifetime,"* the policy refers to dividends and advises that the insured may choose to use the dividends in any one of the following ways: Paid-up additions, dividend accumulations, premium payment, cash. (Complaint at GD95-16273, ex. F at 5.)

In addition, without further investigation, Mr. Drelles could not have reasonably believed that this 1988 transaction had nothing to do with accumulated dividends and interest rates because of the charts that Mr. Sherman had showed Mr. Drelles. (Sherman's motion, ex. G.)

The discrepancies between Mr. Sherman's representations and the provisions within the policy are even more obvious for the 1990 transaction. The first two sentences of the cover sheet of the policy read as follows:

*"Survivorship Life policy, payable on second death.*

*"Premiums payable to second death, or to age 99 of the younger of the surviving lives."*

Also, the first page after the table of contents shows a premium of $6,716, beginning January 25, 1990 and provides that "PREMIUMS PAYABLE AT ANNUAL INTERVALS TO SECOND DEATH, OR TO AGE 99 OF THE YOUNGER OF THE SURVIVING LIVES, AS FOLLOWS." (Complaint at GD95-16273, ex. K.)

In addition, it is clear from a review of the policy that the policy can accumulate value through annual dividends. The third line of the cover sheet of the policy states, *"Participants (eligible for annual dividends)."* The policy provides that the insured may use the dividends to purchase more insurance, take the dividends in cash, use it to pay part of the premium due, or leave it to Metropolitan Life "to accumulate with interest at 3.5 percent per year plus any extra interest we may determine." *Id.* at 5-6.

This case differs from the *Half, Donahue,* and *Kresovich* litigation because Mr. Drelles is an extremely sophisticated investor. Thus, a cursory review of the information provided to him should include a cursory examination of the policy.

In his own financial transactions, Mr. Drelles is not a purchaser who would be overwhelmed by a skillful presentation. He testified that when making investment decisions as part of his job, he never relied solely on oral statements of an individual on what is an appropriate investment choice. (T. 88.) He knew the difference between term life and whole life insurance. He would be expected to have some questions about a proposed investment package (which was not an annuity) that did not appear to be dependent upon interest rates or the performance of the stock market. He was shown charts that he was capable of understanding, which showed that this transaction had something to do with interest rates and accumulated value. Also, he was very capable of learning what he had actually purchased through a cursory examination of the insurance policies.

The 1996 action was instituted on November 30, 1996. Plaintiffs received a copy of the 1990 insurance policy in June 1990. Consequently, this lawsuit was filed more than six years after the alleged wrongdoing. As I have discussed, if plaintiffs had reviewed even only the cover sheet of the policy, they would have seen that it did not guarantee that 10 annual payments of $6,700 would produce a fully paid policy. For these reasons, the causes of action raised in the 1996 lawsuit based on Mr. Sherman's misrepresenting that plaintiffs were purchasing a policy that would be fully paid upon payment of $6,700 for 10 years are barred by the statute of limitations.[12]

---

12. A court shall decide whether, as a matter of law, the evidence that is most favorable to the party who did not file the lawsuit within the limitation period is sufficient to invoke the discovery rule or the concealment doctrine. *Gatling v. Eaton Corp.,* 807 A.2d 283 (Pa. Super. 2002); *Haggart v. Cho,* 703 A.2d 522, 528-30 (Pa. Super. 1997).

I am also dismissing the misrepresentation claims against Mr. Sherman based on the alleged misrepresentation that the insurance proceeds would not be part of the estate of either plaintiff. Mr. Drelles testified that shortly before he met with Mr. Sherman, he had consulted with a lawyer regarding estate planning. If it was important to plaintiffs that the insurance proceeds not be part of the estate, plaintiffs needed to further consult with their attorney for estate planning rather than relying on tax advice given by an insurance representative whose goal is to sell insurance.

The 1995 lawsuit also seeks recovery based on allegations involving the 1990 policy. Counts I, II, and V are barred by the statute of limitations because the lawsuit was not brought within two years after Mr. Drelles received a copy of the 1990 insurance policy.

Count VI—breach of implied covenant of good faith and fair dealing—is dismissed because this breach is not the basis for a separate cause of action. See page 260 of this opinion.

As to the 1990 policy, Counts III and IV raising claims under the Unfair Trade Practices Act are not barred by the statute of limitations.

I am dismissing these counts because, as a matter of law, plaintiffs cannot establish that they reasonably relied on Mr. Sherman's representations. For the reasons I have discussed, plaintiffs cannot rely on the representation that 10 annual payments of $6,700 will produce a paid up policy. These representations are inconsistent with the contents of the cover sheet of the policy and other provisions throughout the policy. Also, as I previously discussed, Mr. Drelles had his own attorney for

estate planning purposes. (T. 121.) He should have consulted this attorney, rather than a MetLife representative selling insurance to him, if he needed tax advice regarding the manner in which insurance proceeds would be taxed.[13] See *Porreco v. Porreco,* 571 Pa. 61, 811 A.2d 566 (2002).

## V.

## *Toy v. Metropolitan Life Insurance Company et al.*

Plaintiff's motion for partial summary judgment and the motion for summary judgment of MetLife and Robert Martini are the subjects of part V of this opinion.

In her amended complaint, plaintiff alleges that in February 1992, she purchased a whole life insurance policy while believing that she had invested in a retirement plan. She alleges that she was the victim of a scheme in which MetLife sold whole life insurance policies by misrepresenting them as retirement or savings plans. Its agents were instructed never to use the words "life insurance" or "life insurance premiums" but to use the words "investment," "retirement savings plans," or "deposits" during the sales representations. Thus, customers, including plaintiff, who were interested only in purchasing retirement plans ended up with life insurance policies without knowing that this is what they had purchased. Plaintiff alleges that MetLife engaged in this practice because the premiums and administrative fees

---

13. The cover sheet of the 1990 insurance policy provided for a 10-day right to return the policy. Consequently, even after receipt of the policy, plaintiff could have consulted with his attorney.

for life insurance are much higher than those for annuities and similar retirement products.

The amended complaint contains six counts: Count I raises common-law fraud and deceit claims based on defendants' misrepresenting the true nature of the product; Count II raises negligence claims based on defendants' failure to furnish information concerning the actual nature of the transaction; Count III raises a violation of the Consumer Protection Law based on defendants' representing that the insurance policy which plaintiff purchased had characteristics which it did not have; Count IV also raises a violation of the Consumer Protection Law based on fraudulent misrepresentations; Count V is a negligent supervision claim; and Count VI is a bad faith claim under 42 Pa.C.S. §8371 based on the prohibitions in the Unfair Insurance Practices Act against unfair or deceptive acts or practices.

Plaintiff's motion for partial summary judgment is based on allegations that the Pennsylvania Insurance Department made a finding that MetLife's sales force in Pennsylvania was deceptively selling whole life insurance policies disguised as retirement/savings plans. The report of the Insurance Department states that various forms of advertising developed and used by MetLife sales representatives were designed to preclude proper disclosure of insurance sales to Pennsylvania consumers.[14] (Plaintiff's brief in response to defendants Metropolitan Life and Bob Martini's motion for summary judgment, ex. 1 at 97.) Plaintiff contends that in this case she may

---

14. These administrative findings became final because MetLife did not contest them. (Defendants Metropolitan Life Insurance Company's and Robert Martini's brief in opposition to plaintiffs' motions for partial summary judgment at 2.)

use the findings of the Pennsylvania Insurance Department to collaterally estop and bar MetLife and its sales agents from relitigating and collaterally attacking the prior determinations and findings of the Insurance Department that deceptive sales practices were committed.

I am dismissing this motion on the basis of the reasoning of Chief Judge Ambrose in a ruling made in *Mohney v. Metropolitan Life Co.*, civil action no. 96-186 (W.D. Pa. 6/2/03). (Defendants' brief in opposition, ex. 1 at 6-14.)

Plaintiff testified that a MetLife representative (Bob Martini) arranged to meet with her to discuss retirement plans. At this meeting, he described a MetLife 50/50 Savings Plan. He explained how plaintiff, then age 42, would have funds of approximately $100,000 in the plan at age 65 if she would make payments of $50 a month into the plan until age 65. His entire presentation concerned her contributions into the plan and how investments generate income. (Defendants Metropolitan Life Insurance Company's and Robert Martini's motion for summary judgment, ex. B; Toy deposition T. 74, 77, 80-85; and ex. K at 1.) Mr. Martini never said that he was selling insurance or that the product he was describing was whole life insurance. (T. 95.)

When it came time to finalize the transaction, Mr. Martini told plaintiff that she would need to sign a document. The document that she signed is labeled in large letters "Application for Life Insurance." The application included a series of questions regarding plaintiff's health and lifestyle which were completed.[15] Plaintiff's signa-

---

15. Plaintiff testified that the sales representative would have obtained this information from her. (T. 125.)

ture is at the bottom of the application. Plaintiff testified that she did not read what she was signing. She simply signed where she was told to do so because she was only enrolling in a savings plan. (T. 121.)

Less than a month later, plaintiff received a lengthy document (an insurance policy) with the following cover sheet: . . . . [Not published herein.]

Plaintiff did not receive any other writings from Met-Life. Plaintiff never inquired as to whether she would be receiving other documentation. (T. 130-31, 153-55.)

Plaintiff testified that she did not realize she had been sold a whole life insurance policy rather than a retirement plan until 1994 when she received notification from MetLife and through publicity. (T. 92-93.) Her amended complaint states she was not suspicious until she received notice of a Florida class action in 1994. (¶40.)

As I previously stated, plaintiff was 42 at the time of the transaction. She had worked as a registered nurse for approximately 20 years. (T. 20-21.) She and her husband owned a house and at some time refinanced it because interest rates had declined. (T. 14-15.) Prior to the purchase of the policy at issue, she held an annuity issued by Great Western. (T. 63-64.) She and her husband own and operate a small business. (T. 29, 32-41.)

According to the April 1, 2000 report of plaintiff's expert, Unin & Associates (defendants' motion for summary judgment, ex. K), plaintiff made 28 monthly payments of $50. The policy lapsed due to nonpayment of a premium due on June 10, 1994. It then became automatic extended term insurance which expired on June 3, 1995.

Defendants seek dismissal of the misrepresentation counts (Counts I-II) of the amended complaint on three

grounds: (1) they are barred by the two-year statute of limitations; (2) plaintiff could not reasonably rely on these representations; and (3) claims based on these representations are barred by the parol evidence rule.

This lawsuit was not brought within two years after plaintiff purchased the policy; it was brought more than three and one-half years after the policy was delivered to plaintiff. Plaintiff relies on the doctrine of concealment.

The legal standards governing this doctrine are set forth at pages 253-55 of this opinion. The controlling issue is whether plaintiff, more than two years before the filing of the lawsuit, acquired information that would cause a reasonably diligent person in plaintiff's position to no longer rely on defendants' representations.

I find, as a matter of law, that upon receipt of the insurance policy (March 1992) plaintiff could no longer reasonably believe that the transaction did not involve the purchase of life insurance. As I previously discussed at pages 253-55 of this opinion, a plaintiff may no longer rely on a representation, the falsity of which would have been patent if she had made a cursory examination of information made available to her. The cover sheet states that MetLife will "pay the amount of insurance and provide the other benefits of this policy;" it describes Ms. Toy as an insured; it refers to "Face Amount of Insurance $31,544;" it refers to a "Whole Life Policy" with "Life insurance payable when the insured dies" and "Premiums payable for a stated period." In bold print the cover sheet states **"10-Day Right to Examine Policy."**

Upon receipt of this document, Ms. Toy could no longer reasonably believe that her transaction with this

life insurance company involved a savings plan guaranteeing savings of $100,000 in 23 years. At a minimum, she needed to investigate whether Mr. Martini's representations were accurate by further reading the document that, on its face, appears to be an insurance policy, rather than a savings plan. Thus, plaintiff's tort claims are barred by the two-year statute of limitations because the information on the cover sheet of the policy, by itself, bars plaintiff from relying on the concealment doctrine.[16] See case law cited at footnote 12.

I am also dismissing the misrepresentation counts on the ground that plaintiff cannot meet the requirement of justifiable reliance.[17] The cover sheet of the insurance policy placed plaintiff on notice that there appeared to be a discrepancy between the representations of Mr. Martini and the terms of the written agreement between the insurance company and plaintiff.[18] Consequently, plaintiff could no longer rely on Mr. Martini's represen-

---

16. I realize that plaintiff's amended complaint (¶33) and testimony (T. 89, 154-55) assert that Mr. Martini stated that an insurance policy went along with the retirement plan. However, when plaintiff received only an insurance policy and nothing with regard to a savings/retirement plan, she then had a duty to inquire as to why she had received an ancillary document but nothing with regard to what she believed to be the focus of the transaction.

17. The elements of intentional misrepresentation include justifiable reliance on the misrepresentation. *Bortz v. Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999).

18. The record does not show whether plaintiff had made any payments at the time she received the policy. However, the cover sheet of the policy informed her of her right to return the policy and receive a refund of any premium paid. Furthermore, even without the right to return, the policy would have placed plaintiff on notice that she should not be making any additional payments until she understood the transaction.

tations, the falsity of which would have been patent to plaintiff through a cursory review of only the first page of the document that MetLife delivered to her.

I am also dismissing the misrepresentation claims on the basis of the parol evidence rule. Plaintiff could not assume that she had purchased a retirement plan when the cover sheet of the only writing she received indicated that she was purchasing an insurance policy.

This case differs from the *Half, Donahue,* and *Kresovich* litigation in which a policyholder alleges that he or she was misled as to whether the cash surrender values of previous policies would fund a new policy. In those cases, the document that the policyholder received—an insurance policy—is consistent with the transaction into which the policyholder intended to enter. The policyholder was relying on the agent to explain how the policy works—how it will perform as a result of the transfer of cash values of other policies into this policy. When the policyholder examines the cover sheet of the insurance policy, the policyholder sees information that is consistent with what the policyholder believes he or she purchased. There is nothing on the cover sheet to alert the policyholder that the policy differs materially from the terms and conditions which the MetLife representative described. The statements that the MetLife representative made as to how the policy will work are plausible because the policyholder does not know what it costs each year to insure his or her life so the policyholder has no reason to believe that the cash surrender value will not be sufficient to fund the new insurance policy.

I am dismissing the counts based upon the Consumer Protection Law, 73 P.S. §201-1 et seq., because the con-

sumer cannot prevail without meeting the common-law element of reliance. *Weinberg v. Sun Co. Inc.,* 565 Pa. 612, 618, 777 A.2d 442, 446 (2001); *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 398, 676 A.2d 1237, 1241 (1996). As I previously discussed, plaintiff cannot establish justifiable reliance on Mr. Martini's representations because of the information contained on the cover sheet of the insurance policy delivered to plaintiff.

I am dismissing the negligence supervision claims because they are barred by the statute of limitations and because MetLife's insurance representative was not acting outside the scope of his employment. See page 260 of this opinion.

I am dismissing the bad faith claims based on 42 Pa.C.S. §8371. I recognize that I have ruled that this legislation is not limited to the denial of benefits; it also reaches misrepresentations of an insurance company which induce an insured to purchase insurance. See footnote 7. However, recovery based on such representations requires a showing of reasonable reliance upon the representation. The purpose of the legislation is to provide additional remedies for fraudulent misconduct. I am ruling that this legislation did not do away with the common-law element of reliance for the same reasons that the courts have ruled that plaintiffs bringing private actions under the Consumer Protection Law must establish reliance.

## VI.

### *Lasko v. Metropolitan Life Insurance Company et al.*

The motions for summary judgment of MetLife and Steve Gervais seeking dismissal of each of plaintiff's

causes of action and plaintiff's motion for partial summary judgment are the subjects of part VI of this opinion.

This lawsuit was instituted on February 1, 1995. In her complaint, plaintiff alleges that in May 1991, she purchased a whole life insurance policy while believing that she had invested in a retirement plan. She alleges that she was the victim of a scheme in which MetLife was packaging whole life insurance policies as retirement plans. Its agents were instructed never to use the words "life insurance" or "life insurance premiums" but to use the words "investment," "retirement savings plans," or "deposits" during the sales representations. Thus, customers, including plaintiff, who were interested only in purchasing retirement plans ended up with life insurance policies without knowing that this is what they had purchased. Plaintiff alleges that MetLife engaged in this practice because the premiums and administrative fees for life insurance are much higher than those for annuities and similar retirement products.

The amended complaint contains six counts: Count I raises common-law fraud and deceit claims based on defendants' misrepresenting the true nature of the product; Count II raises negligence claims based on defendants' failure to furnish information concerning the actual nature of the transaction and selling a product that plaintiff did not want; Count III raises a violation of the Consumer Protection Law based on representing that the insurance policy which plaintiff purchased had characteristics which it did not have; Count IV also raises a violation of the Consumer Protection Law based on fraudulent misrepresentations; Count V is a negligent

supervision claim; and Count VI is a bad faith claim under 42 Pa.C.S. §8371 based on the prohibitions in the Unfair Insurance Practices Act against unfair or deceptive acts or practices.

Plaintiff has filed a motion for partial summary judgment based on allegations that the Pennsylvania Insurance Department made a finding that MetLife's sales force in Pennsylvania was deceptively selling whole life insurance policies disguised as retirement/savings plans. I am dismissing this motion for the reasons set forth in the *Toy* litigation.

Plaintiff testified that a MetLife representative (defendant Steve Gervais) arranged to meet with her to discuss retirement plans. She advised him that she had sufficient life insurance and that she was looking for a supplemental retirement plan. (See plaintiff's brief in response to defendants' motions for summary judgment, appendix A.) At this meeting, he described a MetLife 50/50 Savings Plan. He explained how plaintiff would have funds of approximately $48,039 at age 65 if she would make payments of $75 a month into the plan until age 65. (See plaintiff's exhibit 9 to plaintiff's reply brief at 22.) His entire presentation concerned her contributions into the plan and how investments generate income. Mr. Gervais never said that he was selling insurance or that the product he was describing was simply life insurance. He never told her that a substantial amount of her payments would be used to pay for life insurance and administrative costs related to life insurance.

In connection with this transaction, plaintiff signed a document labeled in capital letters "APPLICATION FOR LIFE INSURANCE." The application includes a series

of questions regarding plaintiff's health and lifestyle which were completed. Plaintiff's signature is at the bottom of the application. However, the application also included the following handwritten provision which refers to a $75 premium and a sum of $43,666: . . . . [Not published herein.]

In early June, plaintiff received in the mail a binder which she believed to be her retirement plan. (Plaintiff's exhibit 9 to plaintiff's reply brief to defendants' motions for summary judgment.) The binder contained 22 pages of information; the policy was tucked into the back pocket of the binder. (T. 113, 229.) I have attached the cover page and the first eight pages of the binder as attachment 1. [Not published herein.] Ms. Lasko testified that she opened up the binder and skimmed through it. It was highlighted "retirement plan, retirement plan, retirement plan" through the whole binder. (T. 139, 174, 229.) She did not open up what was in the back of the binder. (T. 113, 116.)

Plaintiff testified that she did not realize that she had been sold a whole life insurance policy rather than a retirement plan until March 1994 when she saw a television news story about the misleading sales tactics of MetLife. (T. 120.)

This case differs from *Toy v. Metropolitan Life Insurance Company*, GD95-17627. In *Toy*, plaintiff received an insurance policy with the cover sheet clearly indicating that she had purchased an insurance policy.

The initial pages of the binder Ms. Lasko received are consistent with her having purchased a retirement plan. They are inconsistent with her having purchased a life insurance policy. In the eight pages that I have attached,

there is not a single reference to insurance. The cover page is titled, "Take Shelter from a Taxing Future." Page 2 is subtitled, "Supplementing your Pension and Retirement" and asks if you can "fulfill your retirement plans? . . . make the right decision on your pension plan [and] bridge the pension gap if you jump jobs." The document continues to describe the plan by stating: "own money and earn interest" (at 3); "pick the right financial alternative" (at 4); "This Concept Offers You/Systematic Savings/Tax Deferred Growth/Tax Free Income/Availability of Cash Disability Waiver" (at 6). The next page discusses Social Security and states: "Actuaries: Only 50 Percent Will Be Able to Afford Retiring At 65" (at 7). The final page of attachment 1 ends with: "You need a good plan that will guarantee you a financially secure future" (at 8).

Furthermore, the application that plaintiff signed contained handwritten language consistent with a savings plan.

I do not find that the writings which I have discussed or any other evidence upon which defendants rely compel a finding that plaintiff should have been suspicious of the information furnished by MetLife's representative. Consequently, except for Count VI, this case is governed by the portion of this opinion discussing the summary judgment motions filed in the *Half* litigation.[19]

---

19. Count VI is a statutory bad faith claim brought within less than six years of the alleged bad faith based on conduct occurring after the effective date of 42 Pa.C.S. §8371. In *Hospital Shared Services v. CIGNA Insurance Co.,* 147 P.L.J. 146 (1998), I ruled that an action based on section 8371 is governed by the six-year statute of limitations.

# VII.

## *Gray v. Metropolitan Life Insurance Company et al.*

Defendants' (MetLife and Eugene Vallecorsa) motion for summary judgment seeking dismissal of each of plaintiff's causes of action is the subject of part VII of this opinion.

On the basis of the evidence construed in a manner most favorable to plaintiff, the facts are as follows:

In December of 1988, plaintiff (age 24) met with two MetLife insurance representatives who had been advised by plaintiff's parents that plaintiff might be interested in a savings plan for retirement. (Complaint ¶16; defendants' motion for summary judgment, ex. A, Gray Kiliany deposition 2/28/00, T. 53, 57.)

On October 22, 1976, plaintiff's father had purchased on plaintiff's life a $2,500 20-year payment limited life insurance policy with quarterly premiums of $19.98. Her father was the owner of the policy and the named beneficiary. (Complaint ex. A.) According to plaintiff's expert, this policy had a cash surrender value of $569.89 as of January 5, 1989. (Defendants' motion ex. O.) Plaintiff and her father advised the MetLife representatives that the cash in this policy should be used to assist plaintiff in paying for whatever retirement/savings plan she purchased. (T. 60, 64-65.)

The insurance representatives recommended that plaintiff purchase a Flexible-Premium Multifunded Life Insurance policy that would provide for savings and life insurance. On December 8, 1988, plaintiff signed an application for life insurance (FPMLI) in the amount of

$50,000. The application showed a planned premium amount of $250 per year. The policy was issued on January 3, 1989. (Complaint, ex. B.)

In January 1990, plaintiff received a document titled "Flexible-Premium Multifunded Life Payment Notice" which requested a payment of $507.50. This was larger than she had believed it would be and she could not afford to pay it. (T. 106-107.) Plaintiff telephoned Met-Life to see if there was anything she could do about it. She learned that the premium could not be lowered. She put the bill in a drawer because she could not afford a payment of this amount; she believed the insurance part of the plan would lapse. (T. 108.) In January 1991, plaintiff received a letter from MetLife stating that her insurance coverage was going to end on March 5, 1991 if no payments are made. (T. 110.) No additional payments were made.[20]

This lawsuit was filed on June 27, 1994. Plaintiff raises six counts: Count I—fraud and deceit; Count II—negligence; Counts III and IV—violations of the Consumer Protection Law; Count V—negligent supervision; and Count VI—breach of implied covenant of good faith and fair dealing (including a claim for statutory damages under 42 Pa.C.S. §8371). Plaintiff's claims are based on allegations that because of the misrepresentations of MetLife representatives, plaintiff purchased life insur-

---

20. No payments were ever made other than $569.89 from the 1976 policy. (Plaintiff's exhibits, ex. 4, T. 128-29.) The $569.89 payment is a loss that plaintiff sustained if her father's transfer of the cash surrender value of his policy to his daughter's policy is treated as a gift of $569.89 to his daughter. However, plaintiff cannot raise claims regarding the loss of the $2,500 policy because she never owned the policy.

ance rather than a vehicle providing primarily retirement benefits.

I am granting defendants' motion for summary judgment as to plaintiff's tort claims on the ground that they are barred by the statute of limitations.

These claims were not brought within two years of the alleged misconduct. Plaintiff relies on the doctrine of fraudulent concealment. As I previously discussed at pages 6-8 of this opinion, the issue is whether plaintiff had sufficient information to cause her to believe that she should no longer be relying on the representations of the sales agents that, with the funds from the 1976 life insurance, plaintiff would be able to maintain the policy through payments of approximately $20 per month. See footnote 12 of this opinion. Plaintiff could no longer rely on these representations when she learned in January 1990 that the annual payments were $507.51 and that there was nothing that MetLife could do about it, and when in January 1991 she received a letter from MetLife stating that her insurance coverage was going to end on March 5, 1991.

This lawsuit was not filed even within two years after the policy was canceled. Consequently, the tort claims raised in Counts I, II, and V are barred by the two-year statute of limitations.

I am granting the summary judgment motion dismissing Count VI—breach of implied covenant of good faith and fair dealings (including claims for statutory damages under section 8371).

The conduct which constitutes the alleged bad faith occurred prior to the effective date of section 8371. Statutory bad faith claims may not be based on misconduct

occurring prior to July 1, 1990, the effective date of section 8371. *Ihnat,* 146 P.L.J. 288, 291.

Pennsylvania law does not recognize the breach of the implied covenant of good faith and fair dealings as a separate cause of action. See page 260 of this opinion.

I next consider defendants' motion for summary judgment as to the remaining claims based on violations of the Consumer Protection Law.

I am dismissing the claims raised against Mr. Vallecorsa. Any misconduct occurred during the December 1988 meeting at which plaintiff signed an application to purchase the $50,000 Flexible-Premium Multifunded Life Insurance Policy. There is insufficient evidence to support a finding that Mr. Vallecorsa was present at the meeting. (T. 56.)

It does not matter that he may have been involved in subsequent dealings or that he may have benefitted from the transaction. MetLife representatives who allegedly misled plaintiff were acting as representatives of MetLife—not Mr. Vallecorsa.

MetLife seeks summary judgment as to the counts under the Consumer Protection Law based on its contention that the evidence does not support a finding that MetLife representatives made false representations that were reasonably relied upon.

The facts of this case differ from the facts in the *Toy* and *Lasko* litigation. In those cases, the sales representatives never used the words life insurance or life insurance premiums; they referred only to retirement/savings plans.

In the present case, the MetLife representatives continuously described the product as a Flexible-Premium

Multifunded Life Insurance Policy. Furthermore, plaintiff received numerous writings referring to the purchase of life insurance.

In January 1989, she received a letter from MetLife thanking her for giving MetLife "the opportunity to provide for your insurance needs." The letter stated that MetLife had completed its evaluation of her life insurance application and had issued "your policy in the most favorable class available." However, it became necessary to impose "an extra premium charge" because of your occupational duties. (Defendants' motion, ex. H.)

In June 1989, she received a letter from MetLife's vice president enclosing a "copy of the current Flexible-Premium Multifunded Life Insurance and Metropolitan Series Fund prospectuses." The letter stated that the "Insurance policy offers you premium flexibility and investment options while providing you with valuable insurance protection." It advised plaintiff that she can "choose the investment option for your net premiums,"—referring to a combination of stocks, bonds, and money market deposits. (Defendants' motion, ex. I.)

In her complaint, plaintiff alleges that she was not informed that she was purchasing a life insurance policy with an investment component. (¶29.) Plaintiff also alleges that she was led to believe she was purchasing a retirement plan that would accumulate $100,000 at age 65 and that small premium payments were required. (¶33.)

Her deposition testimony describes the transaction in a somewhat different light from the complaint's description. She was told by the MetLife representatives that this was a good policy because it had both retirement

benefits and life insurance. The main quality of the product was a retirement plan. (T. 60.)

She testified that the MetLife representative told her "if *you continue to put your money in and you increase it, over time it could be* that you will earn at least $100,000 or over $100,000 by the time you retire." (Plaintiff's ex. 4, T. 135.) She was also told that there are different allocations—in some areas you earn more money and there are other areas that are more stable. (Plaintiff's ex. 4, T. 144.) She thought that you pay a certain amount of money in and it earns money based on the stock market and when you reach a certain age you can take out monthly payments for your support—that is what she thought a retirement plan meant. (T. 60.)

She recognized that there were different options with the retirement package. "There [are] some areas, like the stock market, that can make more money or you can also lose money [, but in] some areas it is a little more stable." (T. 71.) She does not remember if, in 1988, she knew the insurance policy was for $50,000. She was focused on the investment aspect. (T. 72.)

She thought the cost of the insurance was going to be minimal—only a small percentage of what she was putting into the investment. She thought she was investing in a retirement policy with an added insurance option. (T. 99.) She thought she was getting a retirement plan or was putting money into an account and a small portion would go toward life insurance. (T. 100.)

On the basis of plaintiff's testimony, I find that she cannot successfully pursue a claim that she sustained damages because of misrepresentations of the MetLife representatives upon which she reasonably relied. Plain-

tiff knew she was purchasing life insurance and participating in a savings program on the basis of representations of the MetLife representatives and the documents that she received.

Plaintiff did not believe she was guaranteed savings in a specific amount because her testimony shows that she knew she would make choices as to investment packages. Her choices depended upon risks that she was prepared to assume. She understood that the savings available to her at retirement depended on what the money earned and the amount of money she contributed.

Plaintiff also received a letter dated January 20, 1989 advising her that it was necessary to issue the policy with an additional premium charge because of her occupational duties. Consequently, she knew that her monthly premium would be more than $20.

While plaintiff testified that the payments going to life insurance were more than what she thought they would be, she does not describe any representations as to the cost to maintain the insurance. Thus, plaintiff has not offered evidence that would support a cause of action under the Consumer Protection Law.

## ORDER

On December 8, 2003, upon consideration of the parties' motions for summary judgment, it is ordered that:

(1) plaintiff's causes of action raised in his amended complaint against Metropolitan Life Insurance Company for breach of the implied covenant of good faith and fair dealing (Count V) and negligent supervision (Count VI) and plaintiff's causes of action raised in his second amended complaint for common-law fraud and deceit

(Count I) and negligence/willful disregard (Count II) are dismissed;

(2) the motions are otherwise denied; and

(3) a pretrial conference will be held on December 22, 2003 at 2 p.m. o'clock.

## ORDER

On December 8, 2003, upon consideration of the parties' motions for summary judgment, it is hereby ordered that:

(1) plaintiff's causes of action raised in his amended complaint against defendants for negligent supervision (Count V) and plaintiff's causes of action raised in his second amended complaint for common-law fraud and deceit (Count I) and negligence/willful disregard (Count II) are dismissed;

(2) the motions are otherwise denied; and

(3) a pretrial conference will be held on December 22, 2003 at 1 p.m. o'clock.

## ORDER

On December 8, 2003, upon consideration of the parties' motions for summary judgment, it is hereby ordered that:

(1) all claims against Mr. Sherman are dismissed with respect to insurance transactions involving Mr. Kresovich;

(2) plaintiffs' causes of action raised in their amended complaint against defendants Jeffrey Joel Sherman and Metropolitan Life Insurance Company for negligent supervision (Count V) and plaintiffs' causes of action based

on the DAC tax for common-law fraud and deceit and negligence, willful disregard are dismissed;

(3) the motions are otherwise denied; and

(4) a pretrial conference will be held on December 22, 2003 at 1 p.m. o'clock.

## ORDER

On December 8, 2003, it is hereby ordered that defendants' summary judgment motions are granted. All counts in the complaint filed at GD95-16273 are dismissed as to all defendants and all counts in the complaint filed at GD96-14270 are dismissed as to defendant Jeffrey Joel Sherman.

## ORDER

On December 8, 2003, upon consideration of the parties' motions for summary judgment, it is hereby ordered that:

(1) plaintiff's motion for partial summary judgment is denied; and

(2) defendants' motions for summary judgment, seeking dismissal of each count of plaintiff's complaint, are granted and plaintiff's complaint is dismissed with prejudice as to both defendants.

## ORDER

On December 8, 2003, upon consideration of the parties' motions for summary judgment, it is hereby ordered that:

(1) Metropolitan Life Insurance Company's motion for summary judgment seeking dismissal of Count V (negligent supervision) is granted;

298

(2) defendants' requests for summary judgment are otherwise dismissed; and

(3) pretrial conference will be held on December 22, 2003 at 1 p.m. o'clock.

## ORDER

On December 8, 2003, it is hereby ordered that defendants' motion for summary judgment is granted and plaintiff's complaint is dismissed.